582 So.2d 1358 (1991)
STATE of Louisiana, Appellee,
v.
Everett T. ENGLISH, Appellant.
No. 22501-KA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
Writ Denied September 20, 1991.
*1360 Hunter, Scott, Blue, Johnson & Ross by Louis G. Scott, Michael A. Courteau, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., Jerry Jones, Dist. Atty., Richard A. Sherburne, Asst. Dist. Atty., Monroe, for appellee.
Before SEXTON, NORRIS and VICTORY, JJ.
NORRIS, Judge.
The defendant, Everett T. English, was charged by amended indictment with two counts of second degree murder, La. R.S. 14:30.1, arising from his participation in the "Moon Lake Murders" of Winston Vandervield and Simmie Stevenson in Ouachita Parish in April 1988. He proceeded to a jury trial and was found guilty on responsive verdicts of manslaughter, La. R.S. 14:31. The trial court later sentenced English to the maximum, 21 years at hard labor on each count, and directed the sentences to be consecutive to one another, as well as to two prior contempt sentences. English now appeals, advancing five assignments of error. For the reasons expressed, we affirm.

Background facts
On the morning of April 12, 1988, patrons of the Moon Lake Recreation Area in northern Ouachita Parish discovered the bodies of two black men lying some distance from the gravel road. One of the victims was 25-year old Winston Vandervield (also known as Otis Strawder). His hands and feet were tied up with neckties, his mouth taped with duct tape, and his head shot in the right side. He also had a large laceration on the right side of his head, above the bullet hole, consistent with a blow to the head or a fall. His body showed a pattern of dirt and debris as though it had been dragged on its back. The other victim was 30-year old Simmie *1361 Lee Stevenson. His wrists were tied with a necktie and white electrical cord, his mouth gagged with a red scarf, and his head shot in the left side. He also had a lacerated lip, suggesting a blow or a fall. Vandervield was pronounced dead at the scene but Stevenson, still breathing laboriously, was taken to North Monroe Hospital. He could not be saved and died that night.
Later in the same day Stevenson's car, a maroon 1983 Monte Carlo, was found on Solvent Street in Sterlington, not far from Moon Lake. Officers found, in the trunk and back seat, large blood stains that were still damp. Deputy Hilton, who dusted the car for prints, found "streaky" areas that appeared to have been wiped clean.
Stevenson's house showed no signs of foul play; however, Vandervield's house on Mississippi Street in Monroe was in disarray, with drawers open and items scattered. The police also found bloodstains on the bedroom carpet; a Church's Fried Chicken box and bottles or cans of malt liquor in the garbage can; and an electric vacuum cleaner with a clipped cord similar to the one found on Stevenson's wrists. Vandervield's sister, Ms. Ballard, added that she saw a white bath towel on the trash can outside the house. Police dusted the house for fingerprints but recovered only one usable print from a beer glass in the kitchen sink. The murder weapon was never found.
In the course of the investigation, Dallas police arrested a suspect who was wearing Vandervield's red jacket and had apparently been driving his car, a white Dodge Shadow. The suspect, James Divers, is Everett English's cousin. Police also matched Divers's fingerprints with those found on the Monte Carlo and the drinking glass at Vandervield's house.
On May 7, Sterlington Police Chief Paul Davis called the Ouachita Parish Sheriff Office to report that a reliable confidential informant had implicated Everett English in the killings. After meeting with the RCI, Deputies Toney and Jones decided to question English.

The Statements
Three deputies went to English's parents' house on the evening of Saturday, May 7. Without arresting or restraining him, Deputies Toney and Jones said they would like to question him about the Moon Lake killings. Officer Moore, the only one in uniform and visibly armed, kept his distance on the street. English hesitated, saying there was no one at home to watch his three-year old daughter, but his parents drove up presently and English willingly accompanied the deputies to the Courthouse Annex. There he was Mirandized and signed a rights waiver form at 8:26 p.m. The deputies then took his oral statement, admittedly with some difficulty as English was nervous, shaken and "afraid to talk." The substance of the statement, as related by Deps. Toney and Jones, was as follows.
On the afternoon of April 11, English ran into Divers, who asked him for a ride home; English agreed and they got into English's white Nissan. Divers asked him to stop at "Jim Bob's" house near Louberta Street; English complied, noting that Divers was flashing his .32 revolver and a lug wrench. After Divers was through talking to "Jim Bob," he returned to the car and asked English to take him to a house on Mississippi Street where a "punk" (homosexual) lived. English complied, but parked several houses down lest he be seen with a "punk." Divers knocked on the door and Vandervield answered; English did not know Vandervield but Divers apparently did, as they started talking. English walked back to his car to get some cigarettes. When he got back, Vandervield and Divers were leaving in Vandervield's white Dodge Shadow to get some chicken; English rode with them to Church's and back. The three went to the bedroom to eat the chicken and watch TV. Vandervield and Divers sat on the bed and English on a chair. At one point Vandervield went to the kitchen and brought English a glass of water.
English had taken one sip when Divers suddenly struck Vandervield in the head with some object, perhaps the lug wrench, *1362 and knocked him to the floor. This so startled English that he "wasted" (spilled) the water and bounded from the room. Divers told him, "You are in it now." Thinking Vandervield was dead, English stayed in the living room and looked out the window. Soon he saw Simmie Stevenson's Monte Carlo pull up. When Stevenson knocked, Divers opened the door and pointed his gun at Stevenson's head and ordered him into the bedroom. There English saw Vandervield lying on the floor, already tied up. Divers gave English the gun and told him to hold it on Stevenson while he went around the house gathering valuables to load in the Dodge Shadow.
English admitted he kept the gun on Stevenson while trying not to look at Vandervield, whom he thought was dead. They could hear Divers backing Stevenson's Monte Carlo to the door; Stevenson began to plead for his life. Divers returned to the bedroom and told English to park the Dodge Shadow some distance away. English did so, then ran back to the house, "knowing" that Divers was going to kill the two men and afraid that if he did not cooperate Divers would hunt him down and kill him too. When English reached the house, he saw that Divers had stuffed the two men into the car but had not yet shot them. Divers then told English to follow him to Sterlington. English complied, driving his own Nissan behind Divers in the Monte Carlo with the two unwilling passengers.
They proceeded north on Hwy. 165; when Divers turned off at Moon Lake, English followed. Even though it was dark, English could not bear to watch the bodies being pulled from the car so he turned his car around in the roadway. He then heard two muffled gunshots about a minute apart. Afterwards, Divers came up to English and said to follow him again; they rode to the old Myles High School in Sterlington. Divers got out of the Monte Carlo and wiped the trunk area with a towel. Then Divers got into English's car and told him to drive back to Monroe. English complied.
Before dropping Divers off near the Dodge Shadow, English stopped at a convenience store. Divers had found a $100 bill either on Stevenson's person or in his Monte Carlo; he changed it at the store and gave English $50. English then dropped him off and did not see him again, although Divers telephoned him about a week later to reassure him that "there was no way that anybody would know that they had anything to do with it."
English finished giving this statement around 1:30 a.m. on Sunday, May 8. According to Deps. Jones and Toney, this was enough information to arrest English. Ready to take a recorded statement, they gave him another rights waiver form, which he refused to sign. He did not ask for a lawyer. English testified at the hearing on the motion to suppress that they arrested him because he refused to give a recorded statement; however, Dep. Toney denied this, citing the unsigned waiver form, which recited that English had already been placed under arrest (this was admitted as Exhibit S-3 at the hearing on the motion to suppress but not introduced at trial). English also testified that he gave the statement only because deputies promised to let him go home if he talked. They admitted telling him he would fare better for telling the truth but categorically denied promising to release him. English was taken to the jail around 2:00 a.m.; as he was being locked up, he told Dep. Toney, "Be sure to come get me * * * and talk to me."
Later that day, at 8:45 p.m., English was returned to the Annex, Mirandized again and questioned further. At 10:40 he was Mirandized yet again and gave a recorded statement which was played at trial. The statement acknowledged all Miranda rights and denied threats, promises, offers or inducements. In substance the recorded statement is identical to the oral one. It adds a few details: right after Divers hit Vandervield, he told English, "I told you we was gonna get some money"; English knew Divers was stealing a TV, tapes and clothes from the house; as late as when he moved the Dodge Shadow, which was loaded with stolen goods, he did not know Divers *1363 was going to kill the men; and he saw Divers wiping the living room with a towel, to erase fingerprints. The statement ended at 11:33 p.m. and English was returned to jail.
The next afternoon, May 9, English told Dep. Rowlan that he wanted to talk some more; that evening, Deps. Jones, Toney and Myers began to take another statement. The gist of this one was that he drove Divers to Vandervield's house but never came back after he left the first time. When the deputies admonished him to tell the truth, he terminated the interview and asked for a lawyer, the first time he had done so since questioning started on May 7. English later volunteered to Dep. Myers that he had told the new story in hopes that he would be charged only with burglary, but it was false and the oral and recorded statements were true.

Discussion: Motion to appoint an investigator
By his fifth assignment English urges the trial court erred in failing to fund an investigator to assist in the defense. By motion of August 30, 1988, English sought specific sums to hire three "required expert witnesses," including a criminal investigator. The trial court denied this motion at a hearing on October 5. English later refiled the motion but at a hearing on March 27, 1989 argued only for a psychiatrist, which was also denied. English now contends he was "cut off" at the October 5, 1988 hearing before he could show that locating the murder weapon was critical to his defense and that an investigator was necessary to locate it.
The right to a private investigator may in many cases be an adjunct to the right to counsel; furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense. State v. Madison, 345 So.2d 485 (La. 1977), and authorities therein. The kind of trial a man gets cannot be made to depend on the amount of money he has. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Thus when an indigent defendant shows that his attorney is unable to obtain existing evidence crucial to the defense, the means to obtain it should be provided for him, either by the indigent defender system or the state. State v. Madison, supra. Nevertheless the burden is on the defendant to make this showing. State v. Monroe, 397 So.2d 1258 (La. 1981), cert. denied 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983); State v. Hodge, 457 So.2d 152 (La.App.2d Cir.), writ denied 459 So.2d 545 (1984). The general allegation that an investigator is necessary to "investigate the entire case" is not sufficient. State v. Jones, 516 So.2d 396 (La. App. 5th Cir. 1987). Moreover, reversal is not warranted in the absence of prejudice. State v. Monroe, supra.
At the hearing on the motion English's counsel asserted that the defense needed an investigator "to see what he will turn up," such as the murder weapon, and to investigate "all of the other facts and circumstances involved in the case." R.p. 248. His expert witness, Mr. Diehlmann Bernhardt, admitted he was unaware of any facts an investigator could develop. R.p. 238. This is not an adequate showing of need and the trial court did not abuse its discretion in denying the motion.
In brief the defendant asserts without discussion that finding the murder weapon would be critical to his defense. True, the murder weapon could be found to be clean of English's fingerprints, but this would not offset his admission that he held the gun on the victims while Divers ransacked the house and prepared to drive them to a secluded area. There is also no showing that any potential ballistics evidence would have been relevant. Under these facts we do not perceive any prejudice arising from the trial court's ruling. This assignment does not present reversible error.

Motion to suppress
By his third assignment English urges the trial court erred in refusing to grant his motion to suppress. He argues that his oral statement was taken after five hours of questioning in a small room, isolated and confined, when he was "visibly *1364 shaken and in a depleted physical and mental condition." He also argues that he was offered promises for his confession, threatened by officers whose weapons were visible, and he asked for an attorney but was refused.
Before a confession can be introduced in evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; State v. Simmons, 443 So.2d 512 (La.1983). The state must also establish that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. State v. Simmons, supra; State v. Kersey, 406 So.2d 555 (La. 1981).
Promises of immunity from prosecution, clemency or leniency, inducements and implied promises will void a defendant's confession. State v. Serrato, 424 So.2d 214 (La.1982); State v. Jackson, 414 So.2d 310 (La.1982). However, a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of the confession. State v. Petterway, 403 So.2d 1157 (La.1981); State v. Jackson, 523 So.2d 251 (La.App.2d Cir.), writ denied 530 So.2d 565 (1988), and citations therein.
When the defendant makes specific allegations of abuse, the state may not rely solely on the testimony of the officer who took the statement but may rebut the allegations by testimony of other officers or persons who witnessed the statement. State v. Davis, 380 So.2d 607 (La.1980), and citations therein. Emotional distress is not grounds for suppressing a confession unless it is so severe that the defendant cannot confess voluntarily. State v. Williams, 383 So.2d 369 (La.1980), cert. denied 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); State v. Beck, 445 So.2d 470 (La.App.2d Cir.), writ denied 446 So.2d 315 (1984).
Whether the state has made an adequate showing that the defendant's confession was free and voluntary depends on the facts of the individual case. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Benoit, 440 So.2d 129 (La.1983). The trial court's findings as to the free and voluntary nature of the confession are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Benoit, supra; State v. Graham, 486 So.2d 1139 (La.App.2d Cir.), writ denied 493 So.2d 633 (1986).
At the hearing on the motion to suppress, the state called Dep. Toney, who conducted and took notes of the first interrogation, and was present at all others; Dep. Jones, who was present at all interrogations; Dep. Myers, who tape recorded the statement on May 8 and was present at the questioning on May 9; and Dep. Rowland and Chief Davis.
Deputies Toney and Jones both testified that English voluntarily came with them to the Annex for questioning. Before questioning, Dep. Jones gave Miranda warnings and English knowingly signed a rights waiver; in the course of the next two days, this procedure was followed six times until English asked for a lawyer on May 9. Both deputies admitted that at the first questioning English was upset, shaking, afraid to talk, and kept asking whether they would let him leave if he would talk. Both admitted they advised him to be truthful and that his legal consequences would depend on his involvement in the crime. Both testified they arrested English on the morning of May 8 because he incriminated himself, not because he refused to give a recorded statement. Both testified English asked them to come back and talk to him.
The second interrogation, at 9:13 p.m. on May 8, yielded no statement. The third, at 10:40 the same night, produced a recorded statement that corroborated the oral statement and repeatedly denied that the deputies practiced duress, intimidation, threats or promises on English. All three deputies testified that the recorded statement was accurate. The fourth interrogation, on the evening of May 9, was also held at English's *1365 request but ceased when, for the first time, English asked for a lawyer.
The trial court, in a per curiam opinion, found that English's testimony as to promises and threats was not credible. R.p. 215C. We consider it significant that English's allegations are the only items at variance with the overwhelming weight of the evidence, particularly the consistent testimony of Deps. Jones, Toney and Myers. We also note that English's oral and recorded statements are almost identical, thus lending weight to that account and detracting from his later testimony at the hearing. The statements deny the use of threats and promises, and assert that English's biggest fear was from his collaborator, James Divers. The testimony of English's mother and sister shows that he went voluntarily to the Annex for questioning, contrary to his argument in brief. Finally there are the various signed (and unsigned) waiver forms which indicate a full understanding of his rights. On this record, the trial court's finding that English's statements were knowing and voluntary is supported by the evidence. The trial court did not err in refusing to sustain the motion to suppress. This assignment does not present reversible error.

Sufficiency of the evidence
By his fourth assignment English urges the verdict was against the overwhelming weight of the evidence. Assuming that the statements should have been suppressed, he argues only that without those statements the evidence is not sufficient to convict him under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Jackson v. Virginia announces the due process standard: the record evidence, viewed in light most favorable to the state, must be sufficient for a rational fact finder to conclude that the essential elements of the crime were proved beyond a reasonable doubt. See also La.C.Cr.P. art. 821. The Jackson v. Virginia standard applies to cases involving both direct and circumstantial evidence. Any conflict in direct evidence must be resolved in favor of the state, and facts proven by direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every element of the crime. State v. Chism, 436 So.2d 464 (La. 1983); State v. Holland, 544 So.2d 461 (La.App.2d Cir. 1989), writ denied 567 So.2d 93 (1990).
Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm, or when the offender is engaged in the perpetration or attempted perpetration of, among other enumerated felonies, armed robbery. La.R.S. 14:30.1A(1), (2). A principal is any person concerned in the commission of a crime, whether present or absent, whether he directly commits the criminal act or aids and abets in its commission. La.R.S. 14:24. A person who aids and abets another in crime is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. La. R.S. 14:23; State v. Watson, 397 So.2d 1337 (La.1981), cert. denied 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981); State v. McAllister, 366 So.2d 1340 (La. 1978).
Manslaughter is defined in part as a homicide which would be second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Manslaughter is a responsive verdict to the charge of second degree murder. La.C. Cr.P. art. 814A(3). Even though the element of "sudden passion or heat of blood" is absent from the definition of second degree murder, the Supreme Court has recognized the validity of the "compromise verdict." In State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. denied 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), the court stated:
[T]he reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, *1366 whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.
See also State v. Schrader, 518 So.2d 1024 (La. 1988); State v. Holland, supra.
Having determined that the trial court did not err in refusing to suppress English's statements, we have reviewed the evidence in light most favorable to the state. English knew that Divers was carrying a gun when they went to a "punk's" house to get some money; when it was done, he accepted $50 cash. He served as a lookout twice: first in the living room while Divers was in the bedroom tying up Vandervield, and second on the gravel road at Moon Lake while Divers was some distance away, dispatching the victims. He held a gun on Stevenson while Divers looted the house. He assisted Divers by moving the loot-loaded Dodge Shadow, following Divers in his own car to Moon Lake and giving him a ride back to Monroe. Several times he had the chance to leave the scene but never did so; once, in fact, he came back running. He claimed to have acted out of fear of Divers, but never asserted that Divers threatened him; this does not excuse his complete and steady cooperation in every phase of the crime. The evidence is sufficient to persuade any rational fact finder that English, beyond a reasonable doubt, aided and abetted Divers in the armed robbery of Winston Vandervield and Simmie Stevenson. This conduct would support convictions for the offense charged. State v. Holland, supra; State v. Doyle, 525 So.2d 1090 (La.App.3d Cir.1988), writ denied 540 So.2d 326 (1989). The verdicts of manslaughter are authorized. State ex rel. Elaire v. Blackburn, supra; State v. Holland, supra. This assignment does not present reversible error.

Excessive sentence
By his first assignment English urges the trial court erred in imposing an excessive sentence. He argues particularly that these were his first felony convictions; he was a youthful offender and college student at the time of the offense; and he was supporting a child. He also argues that both deaths arose from the same incident, thus counseling against consecutive sentences; and that since he did not actually pull the trigger he should not have received maximum sentences.
The test of excessiveness is two-tiered, the first being a review of the sentencing colloquy for compliance with the guidelines of La.C.Cr.P. art. 894.1. State v. Sepulvado, 367 So.2d 762 (La. 1979). The second is constitutional excessiveness. A sentence violates La.Const. art. 1 § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, the sentence shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). As long as it stays within statutory bounds, the court has wide discretion in imposing sentence. Only a manifest abuse of discretion is grounds for reversal. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hudgins, 519 So.2d 400 (La.App.2d Cir.), writ denied 521 So.2d 1143 (1988). Maximum sentences are typically reserved for the worst offender and the worst instance of the crime. State v. Soco, 441 So.2d 719 (La. 1983). The Supreme Court has stated that a maximum sentence is constitutionally excessive unless good reasons exist to distinguish the particular defendant and his crime as deserving of the heaviest sentence possible when compared with other persons in the same offender class and guilty of the same offense. State v. Oubichon, 422 So.2d 1140 (La.1982). One such reason is when the offense does not adequately describe the defendant's conduct. State v. Lanclos, supra; State v. Holland, supra.
Concurrent sentences are the general rule for multiple offenses arising from the same course of conduct. La.C.Cr.P. art. 883; State v. Williams, 445 So.2d 1171 (La. 1984). The court may, in its discretion, expressly direct consecutive sentences. Art. 883; State v. Derry, 516 So.2d 1284 (La.App.2d Cir.1987), writ denied 521 So.2d *1367 1168 (1988). In so doing the court may consider all the art. 894.1 factors plus whether the defendant poses an unusual risk of harm, in imposing consecutive sentences. State v. Sherer, 437 So.2d 276 (La.1983); State v. Lighten, 516 So.2d 1266 (La.App.2d Cir.1987).
The court took each sentencing factor in order and thoughtfully analyzed it in light of the personal data in the presentence investigation report, which the defendant did not traverse. English was 21 years old, unmarried but with one child; a high school graduate and student at NLU; had one brother, two sisters and several halfsiblings. In high school he had problems dealing with authority and was not a good student. He had a juvenile offense for theft of a dog but finished probation satisfactorily; two adult arrests for simple battery, which were nol prossed; and an arrest for disturbing the peace by fighting, resulting in a bond forfeiture judgment.
Reviewing the facts of the case the court noted that English failed on several occasions to abandon this criminal activity. The victims neither provoked nor facilitated the offense, and yet English was not really the aggressor. This incident and his disciplinary problems in high school indicate little respect for law or authority and suggest that criminal conduct will likely recur. Even if English did not intend to kill the victims, his complicity in guarding them bound and gagged and helping to drive them to a secluded area was in utter disregard for human life. The court also noted with disfavor English's apparent effort to protect Divers, to the extent of refusing to testify against him.
While the facts would have supported convictions of second degree murder, the jury's lenient compromise verdicts reduced his exposure from life without benefit to 21 years at hard labor on each count. In light of the gravity of the case, these sentences are not excessive for the offenses. State v. Holland, supra.
In ordering the sentences to be consecutive, the court stressed that English posed an undue risk of crime. This is not plainly wrong; English's social history shows an inclination to disregard authority, and the facts of the case show a willingness to be dominated by the likes of Divers. These considerations provide adequate justification for the consecutive sentences. Though heavy, the total of 42 years at hard labor does not shock our sense of justice. This assignment does not present reversible error.

Indefinite sentence
By his second assignment English urges the trial court erred in imposing an "indefinite sentence." The minutes show that English was held in civil contempt on February 7, 1990 for refusing to submit a handwriting exemplar; the court sentenced him to six months in jail, consecutive to any other sentence. English also alleges, and the state concedes, that he was held in contempt in James Divers's trial on March 21, 1990, for refusing to testify against Divers in spite of a grant of use immunity; the court sentenced him to jail until he would testify. At the time of the instant sentencing (April 9, 1990), English was apparently still in jail on these contempt sentences; the instant sentences were made consecutive to both contempts.
English has not appealed or sought writs on the February 7, 1990 contempt ruling and it is not before us. As for the March 21 contempt ruling, English took writs which were denied by this court on May 3 and by the Supreme Court on June 1, 1990. State v. English, 563 So.2d 1157 (La.1990). We decline to reconsider the matter. There is nothing to review in these contempt rulings.
Furthermore, the instant sentence is in no way indefinite; only its commencement date cannot be fixed until the contempt is served. We will not reduce a legal sentence simply to accommodate a defendant who through contumacious conduct has brought additional penalties upon himself. This assignment has no merit.

Conclusion
We have reviewed the record and find nothing we consider to be error patent. *1368 La.C.Cr.P. art. 920(2). The convictions and sentences are therefore affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.