601 So.2d 339 (1992)
STATE of Louisiana, Appellee,
v.
Darrell JONES, Appellant.
No. 22753-KA.
Court of Appeal of Louisiana, Second Circuit.
May 13, 1992.
Rehearing Denied June 18, 1992.
Writ Denied October 9, 1992.
*340 Hall & Golden by W. Eugene Golden, Shreveport, for appellant.
Richard Ieyoub, Atty. Gen., James M. Bullers, Dist. Atty., for appellee.
Before MARVIN, LINDSAY and VICTORY, JJ.
LINDSAY, Judge.
The defendant, Darrell Jones, was originally charged with second degree murder, in violation of LSA-R.S. 14:30.1. A jury convicted him of the lesser offense of manslaughter, in violation of LSA-R.S. 14:31. The defendant was sentenced to imprisonment at hard labor for a term of seven years. For the reasons assigned below, we affirm the defendant's conviction and sentence.

FACTS
The defendant, a 20-year-old student at Grambling State University and a resident of Dallas, Texas, decided to spend the 1989 Labor Day weekend at the home of his uncle in Minden, Louisiana. At about 10 o'clock on the night of Saturday, September 2, 1989, the defendant left his uncle's house with his cousins, Cedrick and Felicia Jones, and a college friend, Jerry Justice. The group rode in a Monte Carlo automobile owned by the defendant's brother, Tyrone, and which was being driven that night by Cedrick. They stopped at a Super Discount store to purchase a case of 16-ounce Bull Malt Liquor before going to the Starlight Club in Gibsland. They stayed at the club until it closed at midnight. Then the group went to the intersection of East Union and Gum Streets in Minden, a local meeting place. They parked their car next to Joe's Dixie Cream and visited with various friends.
While at this location, Cedrick and another man got into an argument. As a result of this confrontation, Cedrick returned to the car and obtained a .38 caliber pistol which he fired in the air. The other man retreated to his Subaru automobile and drove off, backing up to go around the Dixie Cream building. As the Subaru drove around to the other side of the building, Cedrick also ran over to that side. The Subaru driver apparently tried to run over Cedrick, who fired at least one more shot in the air.
The Jones group returned to the Monte Carlo. Before getting back in the car, the defendant had to raise the hood and connect some wires to turn on the headlights. With Cedrick driving, the defendant occupied the front passenger seat. Felicia sat behind the defendant, and Jerry was seated behind Cedrick.[1] Lanetta Hollingsworth, who joined the group at Joe's Dixie Cream, sat in the middle of the back seat.
Cedrick drove down East Union Street and turned left on Gum Street. Suddenly a shot was fired from the front passenger seat of the car. Stephen Anderson, a bystander who was standing with a group near the corner, was struck in the back of the head by the bullet. He subsequently died from his injuries.
Following the shooting, the group in the Monte Carlo drove to a park near the Jones residence. Later, several friends came to the park and informed them that Cedrick had shot someone. (Apparently, due to the earlier incident between Cedrick and the Subaru driver, they assumed that Cedrick was the gunman.) Also, the mere possession of the gun was a violation of Cedrick's probation for simple robbery. Consequently, in order to protect Cedric, the defendant, *341 as well as Felicia and Jerry, decided to lie to the police by denying the presence of a gun. The gun was hidden in the yard of the Jones residence by Cedrick's brother, Roderick, who later surrendered the weapon to the authorities.
Shortly thereafter, the police came to question Cedrick, who had been identified as the driver of the car from which the shot was fired. The officers left but subsequently returned to arrest Cedrick for illegal use of a firearm. Later that morning, the other occupants of the Monte Carlo went to the police station. At that time, the defendant was arrested for the attempted murder of Mr. Anderson. A photo-electric intoximeter (PEI) test conducted on the defendant registered an alcohol level of .103 percent. Following Mr. Anderson's death on September 5, 1989, the charges against the defendant were upgraded to second degree murder.
The defendant was indicted for the offense of second degree murder. At trial, he contended that the weapon accidentally discharged while he was trying to unload it. At the conclusion of the trial, the jury returned a responsive verdict of guilty of the lesser offense of manslaughter. The trial court sentenced the defendant to serve seven years at hard labor.
The defendant appealed. He argues that the evidence was insufficient to support a conviction of manslaughter and that his sentence of seven years was excessive.

SUFFICIENCY OF EVIDENCE
The evidence in the record, viewed in the light most favorable to the state, must be sufficient for a rational fact finder to conclude that the essential elements of the crime were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard applies to cases involving both direct and circumstantial evidence. Any conflict in direct evidence must be resolved in favor of the state, and facts proven by direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every element of the crime. State v. English, 582 So.2d 1358 (La.App.2d Cir.1991), writ denied, 584 So.2d 1172 (La.1991).
Manslaughter is defined, in pertinent part, as:
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 [first degree murder] or 30.1 [second degree murder], or of any intentional misdemeanor directly affecting the person; ...
LSA-R.S. 14:31.
Consequently, in the present case, the state had to prove that the defendant was guilty of the underlying offense of illegal use of weapon, in violation of LSA-R.S. 14:94, or of aggravated assault, in violation of LSA-R.S. 14:37.[2]
The defendant's primary contention under this assignment of error is that the testimony of Cedrick Jones, the only person in the car to specifically testify that the shooting was not accidental, was completely and totally unworthy of belief.
Cedrick testified that after he fired the pistol while the group was at Joe's Dixie Cream, the defendant asked him for the weapon. He gave the pistol to the defendant who then walked back to the car. Cedrick testified that, just before the defendant fired the gun, some "guy" walked toward the car and the defendant told this *342 "guy" to back off. He also testified that the defendant was hanging out of the car window with the gun when the shot was fired and that the gun was pointed toward the rear of the car. Cedrick stated that after the shooting he stopped the car near the bridge on Gum Street and asked the defendant why he fired the gun. The defendant told him no one was hurt and to drive on.
Cedrick testified that he drank about four bottles of malt liquor that night. He admitted telling defense counsel that the shooting was an accident, but he maintained that he only said that to placate the attorney. Cedrick also admitted that he was still facing charges for illegal use of a firearm, and that the state had upset and continued his trial on four occasions.
Felicia, Cedrick's sister, testified that after her brother fired the gun at the Dixie Cream, she told the defendant to take the gun from him. She stated that the defendant did so and then walked back to the car. Felicia also testified that she was sitting in the back seat behind the defendant, but that she was unable to see what he was doing because the Monte Carlo had unusually high bucket seats in the front. Thus, she was unable to say whether the defendant was leaning out of the car window when the shot was fired. While she initially testified that the gun was outside of the car, she stated on cross-examination that it could have been inside the car. She was only certain that she saw the "flame," or flash, of the firing gun outside of the car.
Felicia also admitted initially lying to the police to protect her brother, but stated that she later told them the truth. She also maintained that she told the police that the gun discharged accidentally.
Lanetta Hollingsworth, the passenger who was sitting in the middle of the back seat, testified that she did not know who had the gun when they got in the car. She testified that she heard the shot and that Cedrick stopped the car right away and asked the defendant why he fired the gun. She stated that the defendant did not immediately answer Cedrick because he had been leaning out of the window from the waist up and was pulling himself back inside. On cross-examination, she stated that she was unable to say whether the defendant had merely been looking toward the rear of the car. She said that she and Felicia looked behind them but could not see anything.
Lanetta also testified that she did not see anyone approach the car prior to the shooting or hear anyone threaten the defendant. She further stated that (for some unexplained reason) she and Felicia ducked down in the back seat as the car turned down Gum Street just before the shooting and that they stayed down until the car stopped.
The defendant testified that while they were at the Dixie Cream, Felicia told him to grab Cedrick because he had a gun. He testified that he grabbed him, but Cedrick broke loose after the first gunshot. Thereafter, Felicia and Jerry got Cedrick back in the Monte Carlo. When they were in the car, Felicia told him to take the gun from Cedrick. The defendant testified that he put his beer down and took the gun, which he then began to unload. He testified that while he was attempting to unload the gun, it accidentally discharged. He stated that he then leaned out the window to look behind them, but saw nothing. He said Cedrick slowed down near the bridge but did not come to a complete stop. He also testified that he gave the gun to Roderick and Felicia at their request and told them to do what they wanted with it.
Like Felicia, he admitted initially lying to the police to protect Cedrick. However, he maintained that after he was accused of shooting Mr. Anderson he tried to explain how the "accident" occurred, but that Detective Gary Valentine did not "really" give him a chance to demonstrate how he was trying to unload the gun. He also admitted drinking four to five bottles of malt liquor that night.
Two other witnesses testified that they were standing near the victim at the time of the shooting. Samuel Elkins testified that he was about five feet from the victim. The Monte Carlo was moving slowly, and it *343 had driven a short distance past where they were standing when the shot was fired. Mr. Elkins stated that he never saw the gun outside the car and that the flash from the discharging weapon came from inside the vehicle. He further admitted that he probably would have seen anyone hanging out of the car window. Trant Jackson likewise testified that he would have seen the gun or the gunman if they had been outside of the car, but that he did not. He said the area was well-lit and that he was specifically looking in the car for Lanetta. He also testified that the "flame" from the gun came from inside the car and that there was no communication between the persons in the car and those outside of it. Nor did he see the car stop. Mr. Jackson also confirmed that the shot was fired after the car drove past them.
Detective Valentine of the Webster parish sheriff's office testified that the defendant initially denied shooting anyone. When the detective informed him that other occupants of the car said he had fired the gun, the defendant admitted the discharge of the weapon, but claimed it fired accidentally. He then demonstrated the manner in which he was allegedly trying to unload the gun when it fired. Detective Valentine testified that the gun could not have fired if it had been in the position shown by the defendant. Furthermore, even if it were possible for the gun to have discharged in that position, the bullet would have gone down into the floorboard.
Roderick Jones, Cedrick and Felicia's brother, testified that the defendant asked him to hide the gun. Tyrone Jones, the defendant's brother, testified that the gun belonged to him and that he left it in the trunk of the Monte Carlo. He and their mother testified that the defendant had no involvement with drugs or gangs.
It is the function of the jury, and not that of the appellate court, to assess the credibility of witnesses. State v. Holland, 544 So.2d 461 (La.App.2d Cir.1989), writ denied, 567 So.2d 93 (La.1990); State v. Shepherd, 566 So.2d 1127 (La.App.2d Cir.1990). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness, in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App.2d Cir.1986), writ denied, 499 So.2d 83 (1987). Where the trier of fact has made a rational credibility determination, an appellate court should not disturb that conclusion on review. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Shepherd, supra; State v. Lewis, 577 So.2d 799 (La.App.2d Cir.1991), writ denied, 582 So.2d 1304 (La.1991).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Emerick, 499 So.2d 195 (La. App.2d Cir.1986); State v. Shepherd, supra.
Viewing the evidence presented at trial in the light most favorable to the prosecution, a rational juror could have found beyond a reasonable doubt that the defendant committed a homicide, without any intent to cause death or great bodily harm, while engaged in the perpetration of the illegal use of a weapon, in violation of LSA-R.S. 14:94, a felony not enumerated in either LSA-R.S. 14:30 or 30.1, or aggravated assault, in violation of LSA-R.S. 14:37, an intentional misdemeanor directly affecting the person.
The testimony of the witnesses, particularly the occupants of the car, was frequently contradictory. However, both Cedrick and Lanetta testified that the defendant was leaning out of the window at the time the shot was fired or immediately thereafter. While this evidence might support the possibility that the defendant was looking back to see if anyone was hurt by the accidental discharge of the gun, there was testimony that it was physically impossible for the gun to have fired if it had been in the position claimed by the defendant. Also, the testimony of Felicia and Lanetta that they thought the shooting was accidental is tempered by the fact that neither could observe the defendant's actions to verify that he was trying to unload the gun.
*344 The jury observed the demeanor of all the witnesses, and it was clearly in the best position to weigh their testimony and evaluate their credibility. The jury obviously did not believe defense testimony that Mr. Anderson's death was the result of a mere accident. We cannot undermine that credibility determination based upon the record before us.
This assignment of error is meritless.

EXCESSIVE SENTENCE
The defendant also argues that the trial court erred in imposing an excessive sentence. In support of this contention, he asserts his status as a first offender and a college student, as well as his good work record.
In determining whether a sentence is excessive, the test imposed by the reviewing court is two-pronged. First, the record must show that the trial court took cognizance of the factors set forth in LSA-C.Cr.P. Art. 894.1 which enumerates criteria to consider in determining whether a sentence is excessive. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Hammonds, 434 So.2d 452 (La.App.2d Cir.1983), writ denied, 439 So.2d 1074 (La.1983); State v. Tully, 430 So.2d 124 (La.App.2d Cir.1983), writ denied, 435 So.2d 438 (La. 1983).
After determining whether the provisions of LSA-C.Cr.P. Art. 894.1 have been complied with by the trial court, the reviewing court must then determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant.
The sentencing court is given wide discretion in imposing a sentence within the statutory limits and such a sentence should not be set aside as excessive in the absence of a manifest abuse of discretion by the sentencing court. State v. Square, 433 So.2d 104 (La.1983); State v. Hammonds, supra; State v. Brooks, 431 So.2d 865 (La. App.2d Cir.1983).
A sentence is unconstitutionally excessive in violation of La. Const. 1974 Art. 1, § 20 if the sentence is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980); State v. Cunningham, 431 So.2d 854 (La. App.2d Cir.1983), writ denied, 438 So.2d 1112 (La.1983). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied, 435 So.2d 433 (La. 1983).
A trial court is not required to render a suspended sentence or probation on a first felony offense, but may consider whatever factors and evidence are deemed important to a determination of the best interest of the public and the defendant. State v. McKethan, 459 So.2d 72 (La. App.2d Cir.1984); State v. Tully, supra.
In the instant case, the trial court noted that the defendant had no juvenile or adult criminal record. He graduated from high school in June of 1987 and entered Grambling State University the following fall. For three summers, the defendant worked at the Frito-Lay plant in Dallas, where his mother was employed. When he took time off from school in 1988, he worked at Frito-Lay until he returned to college.
The trial court noted that because of the severity of the offense and the defendant's status as a Texas resident, the probation officer who compiled the pre-sentence investigation (PSI) report did not recommend the defendant for probation or the intensive incarceration program. The trial court found that the defendant's conduct threatenedand, in fact, causedharm to others and that he should have contemplated this result. The court found that there was no justification or provocation for the defendant's actions and that his incarceration would not cause excessive hardship to him or his family. While the court observed that the defendant had no intent to kill, it further found that the overriding factor in imposing sentence was the fact that the life *345 of a completely innocent bystander was "taken and wasted" because of the defendant's conduct.
The maximum sentence for manslaughter is 21 years at hard labor. Thus, the defendant's sentence of seven years is in the lower range. See and compare State v. Montgomery, 525 So.2d 7 (La.App. 3d Cir. 1988), writ denied, 525 So.2d 1046 (La. 1988). In Montgomery, the defendant was indicted for second degree murder in the shooting death of her husband. She was convicted of manslaughter and sentenced to 10 years at hard labor. On appeal, she contended that the sentence was excessive because her actions were "somewhat justified and unintentional." She also claimed that the trial court failed to consider letters sent on her behalf, as well as her exemplary conduct while incarcerated. The appellate court affirmed.
In the present case, we find that the trial court did not abuse its discretion in imposing sentence. It duly considered the mitigating factors in the defendant's favor and determined that a sentence in the lower range was appropriate. However, the trial court also considered the fact that the defendant's dangerous act of firing into a crowd of people led to the death of an innocent bystander. Under these circumstances, where a human life has been so needlessly wasted, we find that a sentence of seven years at hard labor is not excessive.
This assignment of error is meritless.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, VICTORY and STEWART, JJ.
Rehearing denied.
NOTES
[1] Jerry Justice was the only occupant of the car who did not testify at trial.
[2] The illegal use of a weapon is the intentional or criminally negligent discharging of a firearm where it is foreseeable that it may result in death or great bodily harm to a human being. LSA-R.S. 14:94. Criminal negligence is the disregard of the interest of others by conduct which constitutes a gross deviation below the standard of care expected of a reasonably careful person under like circumstances. LSA-R.S. 14:12.

Aggravated assault is an attempt to commit a battery or the intentional placing of another in reasonable apprehension of receiving a battery while armed with a dangerous weapon. LSA-R.S. 14:36 and 14:37.