824 So.2d 1208 (2002)
STATE of Louisiana, Appellee,
v.
Rawleigh MILLER, Appellant.
No. 36,003-KA.
Court of Appeal of Louisiana, Second Circuit.
July 25, 2002.
*1210 Paula C. Marx, Lafayette, for Appellant.
Rawleigh Miller, Pro Se.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Charles L. Brumfield, Assistant District Attorney, for Appellee.
Before BROWN, WILLIAMS and PEATROSS, JJ.
WILLIAMS, J.
The defendant, Rawleigh Miller, was convicted of second degree murder and attempted second degree murder, violations of LSA-R.S. 14:27 and 14:30.1, respectively. He was sentenced to serve life imprisonment for the second degree murder conviction and 50 years at hard labor for the attempted second degree murder conviction, both without benefit of parole, probation or suspension of sentence. The sentences were ordered to be served concurrently. The defendant now appeals. For the following reasons, we affirm the defendant's convictions and sentences.

FACTS AND PROCEDURAL HISTORY
Willie Ann Martin ("Martin") and the defendant were involved in a romantic relationship for five years. The relationship ended in January 1998. During their relationship, the defendant and Martin resided together at Eden Apartments in Bastrop, Louisiana with Martin's two daughters.
On the night of February 22, 1998, Martin and a friend, Louise Rose ("Rose"), went to the Playpen, a nightclub, where they bought two quarts of beer. Martin and Rose consumed the beer while sitting in a car in the parking lot of the Town-house, *1211 a neighboring club. While Martin and Rose were sitting in the car, the defendant drove up and asked Martin if she would give him a copy of her children's birth certificates so that he could claim them as dependents on his income tax return. The defendant had a passenger in the car, a woman, later identified only as "Jennifer," who the defendant was dating.
At approximately 11:30 p.m., Martin and Rose returned to Martin's apartment complex. Martin picked up Brittany, her eight-year-old daughter, from a neighbor who had been babysitting her. Martin then went to her apartment, started watching a movie and fell asleep on the sofa. At some time later, Rose awakened Martin and told her that someone was knocking at the door. After the defendant identified himself, Martin opened the door. The defendant entered the apartment and asked for the birth certificates. As Martin was going upstairs to her bedroom to get the birth certificates, she heard Rose say, "Ouch." Martin returned to the living room where she saw the defendant "hitting" Rose, while Rose was seated on the loveseat. Martin called to Brittany, who had come out of her bedroom. When Brittany would not come to her, Martin ran out of the kitchen door for help.
According to Martin, the defendant followed her out of the door. Martin knocked on several of her neighbor's doors without success. When Martin approached the front door of Lacordia Jones'("Jones") apartment, the defendant started "hitting" Martin on the neck. Martin did not realize that the defendant was stabbing her until she saw the blood. The defendant stabbed Martin in the neck, stomach, arm, and chest. After the defendant left, Martin fell to the ground and started crawling and knocking on other doors for help.
Jones heard Martin knocking on her door and calling her name. Although Jones did not see Martin when she opened her door, she saw the defendant standing across from her apartment building. Jones testified that when she called the defendant's name, he ran away. Jones saw blood on her door and on the surrounding concrete.
At trial, the defendant testified that on the night of the crimes, he took Jennifer home, talked with some friends in a nightclub parking lot and then went to Martin's apartment. Before he arrived at Martin's apartment, he saw a kitchen knife with a brown handle lying on the ground and picked it up. When Martin let him into the apartment, he asked for the birth certificates. Martin asked the defendant why he had the knife in his possession. Martin then went toward her bedroom, but she came back out. According to the defendant, Martin stated that he "should have carried [his] bitch's children on the tax thing."
The defendant testified that Martin slapped him and started cursing at him in a loud voice. According to the defendant, he had the knife in his left hand when Martin slapped him. When Martin attempted to slap him again, he pushed her back. Rose grabbed the defendant's hand. Martin got up and continued hitting the defendant. The defendant testified that he did not know whether Martin or Rose had a weapon, but he saw something silver or shiny. During the incident, the defendant's hand and thumb were cut. The defendant testified that he could not remember stabbing anyone; however, he stated that he believed he was fighting for his life.
The defendant further testified that after the fight, Martin went out of the apartment through the kitchen door and he followed her. The defendant did not know *1212 what Rose was doing when he left. He testified that he saw Lacordia, but that he did not go to her apartment. According to the defendant, he wiped the blood from his hand onto his shirt, and he then placed the shirt and the knife near a wooded trail. The defendant testified that he went to his car and sat in his car wondering about the incident. According to the defendant, he was surprised when Martin slapped him. He testified that he did not have any hostility or anger toward Rose. The defendant also testified that he did not know how Rose was stabbed. He denied having any knowledge of the fact that Martin was hurt and Rose was killed.
Cherri Kyles ("Kyles") testified that she saw the defendant standing by a tree at the Eden Apartments at approximately 1:30 a.m. Kyles further testified that she found out about the incident at approximately 2:00 a.m.
Lashondra Jenkins ("Jenkins") testified that at approximately 3:00 a.m., she heard Martin at her door. Jenkins opened the door and Martin fell onto the floor. Jenkins testified that Martin was bloody from her head to her toes. Jenkins's mother applied towels to Martin's neck, which was gushing blood, while they waited for medical assistance. Jenkins testified that Martin did not have anything in her hand, she was wearing a gown and she did not have on any shoes.
James Lee Wallace, then an officer with the Bastrop Police Department, responded to the call that there was a possible stabbing at the Eden Apartments. He testified that he observed a vehicle leaving Eden Drive from the direction of the apartments. Officer Wallace arrived at the Jenkins' apartment and found Martin on the floor in a pool of blood. Martin told Officer Wallace that the defendant had attacked her and that her daughter was still in the apartment. When Officer Wallace arrived at Martin's apartment, he observed bloody footprints on the kitchen floor. Brittany was standing in the living room. Brittany told the officer that the defendant and her mother were fighting. Officer Wallace testified that Brittany did not say that she saw a knife. As the officer and Brittany left the apartment, Brittany alerted the officer to Rose's body, which was lying in the parking lot. Rose was face down on the ground between her car and Martin's car. Officer Wallace observed a laceration on Rose's neck. Officer Wallace checked Rose for vital signs and concluded that she was dead.
Brittany did not testify at the defendant's trial. However, her stipulated testimony was given to the jury. According to Brittany, she saw the defendant with a knife that had a brown handle. The knife was from her home, but it was not a kitchen knife.
Detective Mike Tubbs of the Bastrop Police Department arrived at the crime scene shortly after the victims had been taken away. Detective Tubbs testified that he found blood on the two cars in the parking lot and a pool of blood at the rear of the vehicles. He further testified that there was a trail of blood from the apartment to the car. According to Detective Tubbs, Rose's watch was found on the ground on the right side of the front door of Martin's apartment and Rose's keys were found under the front door. Detective Tubbs testified that the car Officer Wallace observed leaving the apartment complex was registered to the defendant's mother.
Martin was admitted to the hospital on the night of the incident and was a patient for seven days. She testified that it took her a month to recover. Dr. JoAnne Alley, the general surgeon supervising Martin's surgeries, testified that Martin had stab wounds on both sides of her neck. *1213 She testified that Martin's internal jugular vein, the vein which brings blood from the brain to the heart, was completely transected and her carotid artery was cut. Dr. Alley opined that those injuries were life-threatening.
A jury trial commenced on August 28, 2000. The defendant's trial testimony was consistent with his earlier recorded statement. According to the defendant, the entire incident occurred at Martin's front door. He testified that he believed Martin must have had a knife because his right hand and little finger were cut. He denied that he was upset about the children's birth certificates.
The police located the defendant's shirt in a wooded trail near the apartment complex. Linda Armstrong, an expert in DNA extraction, testing, analysis and interpretation, testified that the shirt contained blood from the defendant and both victims. Detective Tubbs testified that he searched for the knife described by the defendant for at least two days, but it was not recovered.
Dr. Stephen Hayne, an expert in forensic pathology, performed an autopsy on Rose. Dr. Hayne testified that the cause of death was two slash wounds and two stab wounds, producing extensive internal and external bleeding. Dr. Hayne further testified that Rose had small scratches on her face, a bruise on her lower lip, scraping of the skin and abrasions on her elbow and knee. Dr. Hayne testified that those injuries were consistent with running and falling on a hard surface and sliding a small distance. Rose also had ten stab wounds and four slash wounds. Four of the ten stab wounds were located on Rose's back, and one of those four was lethal. Dr. Hayne indicated that one of the non-lethal stab wounds to the victim's back indicated movement of the victim or the assailant. Dr. Hayne explained that the lethal stab wound to the back pierced the victim's left lung causing considerable blood loss. Of the six remaining stab wounds, four were in the victim's chest, one was in her left forearm and one was in the right flank, which is part of the chest wall. The lethal wound to the chest went through the victim's heart and left lung. The stab wound on the victim's left forearm went entirely through the arm and was accompanied by a slash wound. Dr. Hayne classified the wounds on Rose's forearm as defensive posturing injuries.
Dr. Hayne further testified that Rose had three slash wounds to the face, including a lethal slash wound which cut her right jugular vein and vocal chords. In addition, Dr. Hayne observed a gaping slash wound over the upper left chest wall near the collarbone. This wound was lethal because it cut two major vessels allowing considerable loss of blood. Dr. Hayne testified that this slash wound was unusual because of the tremendous force it would take to produce the wound's depth and length of 6.25 inches. Dr. Hayne further testified that the slash wound was not consistent with the victim holding the knife and cutting herself.
Dr. Hayne opined that a sharp-edged instrument with a blade of at least 4.5 inches in length and .75 inches in width could have been used to cause the injuries. He testified that the weapon would be consistent with a folding hunting knife. Dr. Hayne further testified that the depths of the wounds ranged from 1 inch to 3.25 inches. Dr. Hayne stated that he did not know how deep the stab wound to Rose's forearm could have gone because that stab wound went entirely through the forearm.
After viewing photographs of the defendant's injuries, Dr. Hayne testified that the small cuts were consistent with injuries suffered by an assailant. Dr. Hayne also testified that the injuries could be *1214 defensive posturing injuries, but that it would be unusual for Rose's injuries to be self-inflicted assailant wounds.
After a jury trial, the defendant was found guilty of the second degree murder of Louise Rose and the attempted second degree murder of Willie Ann Martin. Thereafter, the defendant was sentenced to serve a term of life imprisonment at hard labor and a term of fifty years at hard labor, both without the benefit of parole, probation, or suspension of sentence, the sentences to run concurrently. The defendant now appeals.

DISCUSSION

Assignment of Error Number One:
By this assignment, the defendant contends the evidence presented was insufficient to convict him of second degree murder and attempted second degree murder. The defendant argues that a preponderance of the evidence shows that his convictions should be reduced to manslaughter and attempted manslaughter.
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, supra; State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
Second degree murder, as it relates to this case, is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Huizar, 414 So.2d 741 (La. 1982); State v. Lewis, 34,805 (La.App.2d Cir.6/22/01), 793 So.2d 302. The offense of manslaughter is defined as a homicide that would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average *1215 person of his self-control and cool reflection. LSA-R.S. 14:31. Attempted manslaughter also requires the specific intent to kill. State v. Hutcherson, 34,540 (La. App.2d Cir.4/4/01), 785 So.2d 140.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. LSA-R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993).
The defendant contends the jury erred in rejecting his version of the incident. However, the defendant did not recall many details of the incident. Furthermore, the defendant's testimony does not suggest that he lacked the specific intent to kill. The defendant admitted that he picked up a knife before the encounter and he had the knife when he left Martin's apartment. Dr. Hayne described the defendant's wounds as small cuts on the right hand that were consistent with self-inflicted assailant wounds. Thus, it was reasonable for the jury to conclude that the defendant held the only weapon. Moreover, even if Martin and Rose had hit the defendant, as he suggested, there is no evidence that the defendant acted with anything other than the specific intent to kill when he stabbed Rose several times in the back, chest and arm, slashed her neck and stabbed Martin several times in the arm, stomach, chest and neck.
In State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454, this Court found that it was reasonable for the jury to conclude that the defendant had the specific intent to kill given the number and nature of the victim's stab wounds. Similarly, in the instant case, there was sufficient evidence to find that the defendant possessed the specific intent to kill in order to convict him of the second degree murder of Rose and the attempted second degree murder of Martin.
The defendant also argues that he is entitled to have his convictions reduced to manslaughter and attempted manslaughter because there was a preponderance of the evidence of the requisite mitigating factors.
The existence of "sudden passion" and "heat of blood" are not elements of the crime of manslaughter, but, rather, are factors in the nature of a defense which may reduce the grade of homicide. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue presented by this argument is whether or not a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by the defendant by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986).
Presumably, the defendant believes that his testimony with regard to the victims' attack of him while he was holding a knife was sufficient evidence to prove that he was provoked into killing one and seriously injuring the other. The defendant testified that Martin slapped him, yelled at him and cursed him. He further testified that it was not until his thumb was cut that the three really began to fight. However, Martin testified that she neither yelled at the defendant nor fought him. Martin testified that the defendant attacked Rose *1216 while Rose was seated on the loveseat. Martin further testified that after she ran from the apartment to seek help, the defendant followed her and continuously stabbed her at a neighbor's door.
The jury's rejection of the defendant's provocation testimony is an issue of credibility and not an abuse of discretion. See State v. Mackens, supra; State v. Byes, 97-1876 (La.App. 4th Cir.4/21/99), 735 So.2d 758, writ denied, 99-1559 (La.11/5/99), 751 So.2d 231. Based on this record, the jury reasonably rejected the defendant's version of the facts and found that no mitigating circumstances were established which would require reduced verdicts of manslaughter and attempted manslaughter. In light of the evidence that the victims were unarmed, the defendant's injuries were self-inflicted and the defendant introduced the knife into the encounter, we find no error in the jury's rejection of the defendant's argument that mitigating circumstances existed in these cases.

Assignment of Error Number Two:
By this assignment, the defendant contends the trial court erred in allowing the state to question the defendant with regard to his felony simple escape conviction committed while the instant charges were pending. The defendant argues that without Prieur notice, this other crimes evidence was prejudicial and inadmissible. The state argues that the evidence of the simple escape conviction was not other crimes evidence, but properly admitted evidence to attack the defendant's credibility pursuant to LSA-C.E. art. 609.1.
The state tendered without objection from the defense. After redirect and recross, the defense objected to the admission of the conviction because it was not provided during discovery.[1] The state noted that co-defense counsel had represented the defendant during that conviction. The trial court allowed the evidence, finding there was a lack of surprise and that evidence of flight was admissible as consciousness of guilt.
In brief, the defendant argues that he was not provided Prieur notice or a hearing. Even if the defendant's argument is encompassed within his trial objection which he based on "a discovery violation," the evidence was introduced to attack the defendant's credibility. Any details regarding the conviction came from the defendant's attempt to explain the circumstances surrounding the escape. A review of the transcript indicates that the state did not elicit details of the conviction, but, rather, the fact that the defendant was convicted, that the conviction was a felony and the resultant sentence. These limited facts are admissible to attack a witness' credibility pursuant to LSA-C.E. art. 609.1. It is well settled that Prieur notice is not required when prior convictions are used to impeach the defendant's testimony. State v. Goza, 408 So.2d 1349, 1351 (La.1982); State v. Prieur, 277 So.2d 126, 130 (La.1973). Therefore, we conclude that the trial court did not err in admitting evidence of the defendant's simple escape conviction. This assignment of error is without merit.

*1217 Assignment of Error Number Three:

By his final assignment of error, the defendant contends the trial court erred in failing to suppress his statement to the police. The defendant filed a motion to suppress, alleging that his statement was elicited unconstitutionally. The voluntariness hearing was taken up at trial when the statement was sought to be introduced. The defendant alleges that his statement should have been suppressed because he was sleepy, tired, intimidated and fearful. He argues that these facts undermined the voluntariness of his statement.
Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; LSA-C.Cr.P. art. 703. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Taylor, 30,310 (La. App.2d Cir.2/25/98), 709 So.2d 883; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023.
Officer Wallace testified that when they took the defendant into custody, they had their guns drawn and asked the defendant to lie on the ground. Officer Wallace verbally advised the defendant of his Miranda rights. Approximately an hour after the defendant's arrest, he gave a recorded statement to the police. Detective Tubbs and Detective Chuck Wilson conducted the interrogation.
Detective Tubbs advised the defendant of his Miranda rights using a written waiver of rights form. Detective Wilson was present when Detective Tubbs advised the defendant of his rights. The detectives testified that the defendant indicated that he wished to waive his rights and the defendant signed the waiver of rights form. The detectives testified that they did not intimidate, threaten, coerce, or make any promises to the defendant. Detective Tubbs further testified that the defendant did not appear intoxicated.
A trial court's findings following a free and voluntary hearing are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.6/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir.), writ denied, 584 So.2d 1172 (La.1991). Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.), writ denied, 586 So.2d 545 (La.1991). Police testimony may overcome a defendant's claim that his statement was involuntary because he suffered from a wound or lack of sleep. State v. Billiot, 94-2419 (La.App. 1st Cir.4/4/96), 672 So.2d 361, writ denied, 96-1149 (La.10/11/96), 680 So.2d 655.
In the instant case, the evidence shows that during the defendant's apprehension, guns were drawn on the defendant, he was told to lie on the porch of his mother's home and an officer put his knee on the defendant's back while he was being handcuffed. Further, the defendant testified that he had only ten minutes of sleep before his arrest, he suffered from high blood pressure and he had a headache at the time of questioning. Before the interrogation, the defendant was required to strip naked and surrender his clothing as potential evidence.
During the free and voluntary hearing, Detective Tubbs testified that he took a recorded statement from the defendant. Detective Wilson was also present during the questioning. Detective Tubbs advised the defendant of his Miranda rights. *1218 Both officers testified that the defendant indicated that he understood his rights and waived them. They further testified that they neither offered the defendant any inducements or promises nor coerced or threatened him. During the questioning, the detectives were unarmed and the defendant was not handcuffed. Detective Tubbs testified that the defendant did not have any major injuries, only a scratch on his thumb and a small cut on the hand. The detectives acknowledged that the defendant complained of a headache near the end of the statement. According to Detective Tubbs, the defendant declined medical treatment.
Although the defendant testified that he was tired, sleepy, had high blood pressure, and was suffering from the flu and shaking, Detective Tubbs testified that the defendant was extremely calm and cooperative and appeared unaffected by the night's events. Therefore, the police testimony clearly rebutted the defendant's claims that the night's events, his arrest, and his high blood pressure undermined the voluntariness of his statement. Thus, we find that the trial court's conclusion that the defendant's statement was freely and voluntarily given is fully supported by the evidence.
This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The defendant filed a discovery motion requesting copies of his criminal arrests and convictions and notice of the state's intent to offer other crimes evidence pursuant to LSA-C.E. 404. Further, the defendant filed a motion in limine to prohibit the introduction of the defendant's involvement in any crime other than the instant prosecution and any evidence of bad character. During the hearing on the motion in limine, the state advised that it did not intend to use any such evidence during its case in chief, but that it reserved the right to use the evidence during other parts of the trial. The trial court noted that if the state changed its mind, it would need to give Prieur notice.