liMARVIN, Chief Judge.
After pleading guilty to first degree murder with a Crosby reservation and being given the mandatory sentence, Pierre T. Jackson appeals the trial court’s denial of his motion to suppress his confession to police. State v. Crosby, 338 So.2d 584 (La.1976).
We find no merit to his six argued assignments and affirm.

FACTS

The victim of the January 1994 murder to which Jackson confessed was 86-year-old Mrs. Ladelle Buggs. Jackson had apparently burglarized her rural Claiborne Parish home earlier in 1993. An arrest warrant charging Jackson with that burglary was signed in April 1993. Attempts to execute the warrant during that year proved unsuccessful.
On Monday morning, January 24, 1994, when relatives alerted authorities they could not locate Mrs. Buggs, her home was investigated by Claiborne Parish deputies. Deputies found blood smears on the storm door, several rooms in disarray, blood in Mrs. Buggs’ car, and mud on the rear tires, wheel covers and rear quarter panel. Her microwave was found in the trunk of her car and her walking cane, stained with blood, was in the carport. Mchael Davis, a neighbor, reported seeing a car that resembled Mrs. Buggs’ ear late Sunday night on a rural road north of her residence.
Because of the condition of her home and the unexplained absence of Mrs. Buggs, Claiborne Parish authorities immediately resumed their efforts to locate Jackson on that day and execute the 1993 burglary arrest warrant. Acting the next night on a tip from a confidential informant, Deputy James Spil-lers stopped a black Chevrolet truck in which he had been told Jackson would be riding. Spillers announced he had a warrant for the arrest of Jackson, charging him with the burglary. Jackson, a passenger in the truck, first said his name was Randy Bailey, |2but soon admitted his true identity and was arrested and taken into custody about 9:00 p.m. on January 25,1994.
Jackson’s first assignment of error contends Deputy Spillers did not have probable cause for the “traffic stop.” The 1993 arrest warrant for Jackson authorized and indeed required the deputy to stop and arrest Jackson wherever he found him in the deputy’s territorial jurisdiction [Claiborne Parish], whether Jackson was on foot or being transported by any means. La.C.Cr.P. arts. 204, 205, 213, 216. This assignment has no merit.
Once Jackson was in custody, Deputy Chuck Talley read Jackson his Miranda rights and presented him with an advice of rights form that also stated that he wanted to question Jackson about the 1993 burglary of Mrs. Buggs’ home. Jackson signed the advice of rights form, saying to Deputy Spil-lers that he understood the Miranda rights or warnings. This initial interview was limited to questions regarding the April 1993 burglary.
The next morning, January 26, 1994, at approximately 7:30, Jackson informed Talley that he wanted to talk him about Mrs. Buggs. Talley again advised Jackson of his Miranda rights and presented him with a second advice of rights form which Jackson signed, again saying he understood his rights. In addition to the required detailed Miranda warnings, the second form contains this written statement: “We want to question you about where Ladelle Buggs is now and where you put her.” During the ensuing *218 conversation, Jackson volunteered to take the deputies to her body.
After directing Deputies Talley, Brown, and Buford to the body in neighboring Union Parish, Jackson was returned to jail and the Union Parish sheriff was notified. Some of these deputies assisted at the crime scene and with the disposition of the body. At 5:18 p.m. on that day, after having the Miranda ^warnings re-read to him and signing a third advice of rights form, Jackson confessed to burglarizing her home, kidnapping her in Claiborne Parish, and to murdering Mrs. Buggs in Union Parish where her body was found. This third form stated that the deputies wanted to question Jackson about the burglary of Mrs. Buggs’ home and her death.
Jackson told the deputies in detail what had occurred, his knocking on Mrs. Buggs’ door and forcing himself inside once she opened the door. He admitted taking telephones, sheets, a microwave, and jars of money. Jackson then forced Mrs. Buggs into the car, drove to a remote location and shot her in the head. Jackson discarded the stolen items, except the microwave, and returned the ear to Mrs. Buggs’ carport.
After his arrest on January 25,1994, deputies placed Jackson alone in a cell block which contained a television, telephone, and beds for 12 prisoners. Before he confessed to the murder on January 26, Jackson inquired as to why he was alone in the cell. When Sheriffs deputies informed him it was for his safety, Jackson stated he was not afraid, and wanted to be put in a cell block with the other prisoners. After reviewing with Jackson the names of the prisoners in the cellblock, Deputy Talley agreed to Jackson’s request. The transcript of Jackson’s confession contains the following exchange:
CT: Now what you asked me, was I going to put you into another room.
PJ: Yeah.
CT: You’re in a cell block by yourself right now.
PJ: Yeah.
CT: And you said that you want to talk to me tonight, so I’ll put you in a room where there’s some people. Right?
PJ: Yeah.
UCT: When we get through here, you’re not going back in that room that you were in. I’m going to put you in another cell block to where there some other people, okay?
PJ: That’s all I want to know.
The above quoted conversation gives rise to Jackson’s assignment that his confession was induced by the “promise” to move Jackson and was not free and voluntary. We shall discuss that assignment with the other related assignments. After the above conversation about the cell-block, Talley then re-read the detailed Miranda rights to Jackson, followed by this exchange:
PJ: Now this part about a lawyer. How am I going to get a lawyer when I’m sitting up here talking to y’all?
CT: Okay, let me write this time down and I’ll tell you. Okay, let me finish this then I’ll answer your question. Do you understand these rights?
PJ: Uh-huh.
CT: Okay. Are you willing to answer questions now without a lawyer present?
PJ: Uh-uh.
CT: Okay. Have any threats, promises, or pressure of any kind been implied to induce you to give up these rights?
PJ: Uh-uh.
CT: Now, like I told you a while ago, we have our tape recorder and camera on, okay. Now, to answer your question about the lawyer is, that if you can not afford a lawyer, the courts will appoint you a lawyer. It will be free of charge. It won’t cost you any money and we will see that that’s done if that’s what you need. If you don’t have the money to hire a lawyer, the courts will appoint you a lawyer.
The above dialogue is the basis for Jackson’s assignment that the deputies ignored his request for a lawyer in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Following the above exchange, Jackson again confessed to the crime.
*219 | ^Confessions
The state must affirmatively show that a confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; State v. English, 582 So.2d 1358 (La.App. 2d Cir.1991). The state must also establish that an accused was advised of his constitutional rights and that he understood and knowingly waived those rights. Id. Law enforcement officials are required to inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one would be appointed for him. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Davis, 92-1623 (La. 5/23/94), 637 So.2d 1012.
Because the trial court has the opportunity to observe the witnesses, and weigh the credibility of their testimony, great weight is placed upon the court’s ruling on a motion to suppress based on factual findings. State v. Jackson, 26,138 (La.App. 2d Cir. 8/17/94), 641 So.2d 1081.

Confinement in Isolation

According to Deputy Talley, the deputies were unaware whether family or friends of Mrs. Buggs were currently incarcerated and placed Jackson in a cell by himself to ensure his safety immediately after his arrest. The following morning, Jackson requested to be placed in the general population. Deputy Talley and Jackson reviewed the public display blackboard that contained the names of the prisoners and the cell block in which they were held and determined no one in the jail population posed a risk to him. Jackson requested to be placed in cell block 100 and Deputy Talley granted this request.
Defendant complained of being alone at the same time he indicated a willingness to talk to the officers concerning the location of Mrs. Buggs. Although |6Jackson’s detailed confession followed the state’s agreement to move him to a cell with other prisoners, there is no evidence to indicate the confession was induced by the promise to move him.
CB: One thing I want to stipulate there. The last part he read to you right here. When it says have any threats or promises been made to you or has pressure of any kind been implied to induce you to answer questions or to give up any of your rights. You shook your head, nodded your head a minute ago.
PJ: I mean no.
CB: Meaning, I took no, but when he asked you, I think you said yes, yes. Now has any pressure of any kind been induced?
PT: No, No.
The conditions of Jackson’s initial confinement appears more convenient than those of the general population in that Jackson would not have to share the telephone or television. The record is devoid of evidence that would indicate the initial confinement was intended, or accomplished, to exert any type of psychological pressure on defendant. To the contrary, the record reveals defendant had regular contact with the deputies and trustees who extended him privileges such as allowing him to use an office phone and purchasing him cigarettes. In short, the record is devoid of evidence to support the assertion that authorities induced Jackson’s confession by agreeing to his request to move him to another cell.

Reasons for Arrest

Defendant asserts the deputies violated La. Const, art. I, § 13 by failing to advise him of the reasons for his arrest. The constitution does not require that a defendant be read the technical definition of a crime in order to be fully advised of the reason for his arrest or detention. State v. Jackson, 523 So.2d 251 (La.App. 2d Cir.1988).
frAlthough deputies suspected defendant in the disappearance of Mrs. Buggs, deputies arrested him pursuant to the 1993 arrest warrant. The first advice of rights form, signed at 9:00 p.m. on January 25, 1994, stated that Deputy .Talley wanted to question Jackson about the 1993 Buggs bur *220 glary. The initial interview was limited to questions about that burglary.
After Jackson volunteered to talk about Mrs. Buggs, Deputy Talley re-read the Miranda warnings from the written advice form which contained the statement that the deputies wanted to question Jackson about the disappearance of Mrs. Buggs. This second advice of rights form was signed by Jackson at 7:30 a.m., January 26, 1994. The third advice of rights form was signed about noon on January 26, 1994. Each time he signed an advice of rights form, Jackson stated that he understood his rights. The third form stated that Jackson would be questioned about Mrs. Buggs’ disappearance and her death. The fourth form was signed at 6:14 p.m. on January 26, 1994. The fact that the officers apparently never stated to the defendant that he could be charged with murder is of no moment. Officers often do not know with what specific crime a defendant will be booked until their investigation is completed. By informing Jackson he was under investigation for either or both the disappearance and death of Mrs. Buggs, the officers complied with the mandate of the constitution. Jackson, supra.
Jackson was aware of the reasons for the questioning before each interview. He was advised that the deputies wanted to know about the 1994 disappearance or death of Mrs. Buggs. Deputy Talley clearly again explained Jackson’s rights to him the fourth time:
CT: No, I have to [again tell you your rights]. You’ll tell me it’s not necessary on your part, but I have to reread this to you. It’s the same thing, but let me re-read it to you, okay. I have to do that. Pierre T. Jackson, Route 2, Box 101 A, Bernice Louisiana. Your age is 29. Your date of birth is February the |813, 1964. You completed the 10th grade. I want to talk to you about the burglary of Ladelle Buggs’ house and the death of Ladelle Buggs. Before I ask you any questions, I want you to understand your rights. You have the right to remain silent. We inform you that anything you say can be used against you in court. You have the right to talk to a lawyer for advice before answering any questions and you may have a lawyer during the questioning. If you want a lawyer during questioning, but can not afford a lawyer, a lawyer will be provided to you at no cost prior to the questioning. If you decide to answer questions now without a lawyer present, you have the right to stop answering in order to get advice of a lawyer or for any other reason that you may have.
Our emphasis.
This assignment lacks merit.

Request for an Attorney

When an accused invokes his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded without objection to further police-initiated custodial interrogation. Edwards v. Arizona, supra. The court further held that an accused, having expressed his desire to deal with the police only through counsel, may not be subjected to further interrogation by authorities until counsel has been made available to him. Under appropriate circumstances, however, this rule is relaxed when the accused himself initiates further communication, exchanges or conversations with the police. See State v. Arceneaux, 425 So.2d 740 (La.1983).
However, a defendant must invoke his right to counsel. The courts will not presume defendant desired to deal with authorities only through his lawyer on the basis of equivocal statements. In State v. Griffin, 568 So.2d 198 (La.App. 2d Cir.1990), the trial court offered to appoint an attorney to represent the defendant; however, the defendant stated he would prefer to retain his own counsel rather than be represented by court-appointed counsel. Subsequently, defendant confessed tojgauthorities after receiving Miranda warnings but before he retained counsel. On appeal, defendant argued that once he placed the court on notice of his desire to obtain counsel, all interrogations should have *221 terminated until such time as he was able to retain counsel. The court rejected this argument and stated defendant’s statement of his preference to retain his own counsel when offered indigent representation by the trial court did not amount to an expression of desire to “deal with police only through counsel” as was contemplated by Edwards.
Here, one day after his arrest, Jackson sent word through the jail trustee that he wanted to talk to Deputy Talley. When Deputy Talley went to Jackson’s cell, Jackson asked to use the phone. After using the phone and returning to his cell, Jackson told Deputy Talley he needed to talk to him about “where Ladelle Buggs was.” Jackson initiated the conversation with deputies about Mrs. Buggs. Prior to taking any statements, deputies fully advised Jackson of his constitutional rights, including his right to counsel and his right to stop answering questions at any time at the time his confession was obtained. His question concerning the procedure of how counsel would be appointed should not be deemed an unequivocal expression of his desire or wish to deal with the deputies only through counsel.
This record reveals Jackson voluntarily and knowingly waived his right to counsel prior to each interview and did not unequivocally invoke his right to have counsel present during questioning.

72 Hour Hearing

Jackson suggests his confession was involuntary and should be suppressed because an attorney was not appointed to represent him until January 27, 1994, 48 hours after his arrest. Louisiana requires an arrested person be brought before a judge for the purpose of appointment of counsel within 72 hours of arrest. La.C.Cr.P. art. 230.1. A person’s right to the assistance of counsel attaches as early as 110his custodial interrogation and no later than the defendant’s initial court appearance or first judicial hearing at the 72-hour mandated time. State v. Carter, 94-2859 (La. 11/27/95), 664 So.2d 367. Miranda v. Arizona, supra, also provides that when a suspect indicates “in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.” State v. Abadie, 612 So.2d 1 (La.1993).
Deputies arrested Jackson on Wednesday January 25, 1994, pursuant to an outstanding arrest warrant. After advising Jackson of his Miranda rights, deputies questioned Jackson about a 1993 burglary of Mrs. Buggs’ home. The following morning, Jackson, on his own volition, initiated the conversation in which he volunteered to take authorities to the body of the missing individual. Moreover, defendant confessed to the murder later that same day after being re-advised of his Miranda rights. On January 27.1994, the trial court appointed a lawyer to represent defendant. The state complied with the dictates of La.C.Cr.P. art. 230.1 and the defendant cites no authority or support of his general argument or contention that the confession was involuntary because counsel was not appointed for him until January 27.1994.
In Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the Supreme Court relaxed the strict standard for a waiver of the right to counsel, except in cases in which the suspect is in fact represented by counsel and adverse criminal judicial proceedings have commenced. In Patterson, the Court refused to bar police from approaching a suspect whose Sixth Amendment right to counsel had attached but who had not retained counsel or had a lawyer appointed for him. The Court explicitly rejected arguments that the Sixth Amendment right to counsel is superior to the Miranda right derived from the Fifth Amendment and that consequently waiver standards for the former should be more stringent than for Inthe latter. Ordinarily, then, the police in the situation addressed by Patterson need only give the accused the standard Miranda warnings in order to provide an adequate basis for the accused’s valid waiver of the Sixth Amendment right to counsel. Patterson v. Illinois, supra.
At the time of his confession, Jackson was not represented by counsel and he had not been charged with the homicide. In that circumstance, Jackson could personally waive his Sixth Amendment right to counsel *222 after receiving Miranda warnings without the presence of a lawyer. State v. Carter, supra. Moreover, Jackson had received three sets of Miranda warnings and had signed three advice of rights forms, acknowledging he understood his rights and the matters to be inquired about during the custodial interrogations. We have no evidence in this record that Jackson ever requested counsel. The record established that he had been given the right to make phone calls and had made at least one call before his confession. The record establishes that Jackson understood and knowingly and voluntarily waived his Sixth and Fifth Amendment rights to counsel as required by La. Const. and Miranda. See State v. Carter, supra. This assignment is meritless.

Illegal Interviews

Jackson also asserts that several exchanges contained in the transcript of the confession reveal authorities had previously interviewed him without advising him of his Miranda rights. While true, this is of no moment. During the preliminary exam and the motion to suppress, Deputy Talley explained that he interviewed the defendant four times over the two-day period in question. Deputy Talley testified he read the defendant his Miranda rights each time. Indeed, four advice of rights forms were signed by Jackson in Claiborne Parish and a fifth form was signed by him in Union Parish. Only two of the Claiborne interviews were recorded and transcribed, the pertinent parts of which are quoted above. The other two Ii2exchanges were very short and informal. One was terminated abruptly by the defendant and one was terminated by law enforcement officials. The statements in the transcript, of course, indicate that the two other conversations were had between police and Jackson, as the Claiborne deputies testified. We have no evidence to indicate the deputies failed to advise defendant of his rights prior to each of the four interviews. This assignment has no merit.

CONCLUSION

We have reviewed the trial court’s denial of Jackson’s motion to suppress his confessions. We find no merit in his assignments of error. The trial court’s ruling and Jackson’s conviction and sentence are AFFIRMED.