975 So.2d 782 (2008)
STATE of Louisiana, Appellee
v.
Jason Eric SCOTT, Appellant.
No. 42,997-KA.
Court of Appeal of Louisiana, Second Circuit.
February 13, 2008.
*783 Charles R. Whitehead, Jr., Natchitoches, for Appellant.
William R. Jones, District Attorney, Julie C. Jones, Assistant District Attorney, for Appellee.
Before BROWN, C.J., and PEATROSS, and LOLLEY, JJ.
BROWN, Chief Judge.
Defendant, Jason Eric Scott, in separate indictments was charged with the aggravated rape of his 4-year-old niece (potentially a capital offense) and pornography involving juveniles. During pretrial proceedings, defendant filed a motion to suppress inculpatory statements. Defendant's motion to suppress in the rape case was presented in two parts. He sought to suppress a statement following an alleged illegal entry of his residence by his brother, who was also the victim's father and a sheriff's deputy; and, second, to suppress statements given while in custody at the sheriff's office. After the motion was denied, defendant entered a guilty plea to a reduced charge of molestation of a juvenile, reserving his right to appeal the trial court's adverse ruling on his motion to suppress. See State v. Crosby, 338 So.2d 584 (La.1976). The pornography charge was dismissed. Defendant was sentenced to ten years imprisonment *784 at hard labor. The trial court's decision is affirmed; however, the case is remanded solely for notification of the sex offender registration requirements.

Discussion
Events Leading to Defendant's Arrest
The incident leading to the rape charge occurred on January 13, 2005, in Red River Parish. Defendant, who was nineteen years old, was the younger brother of Tracy Scott, who was the chief deputy for the Red River Parish Sheriff's Office. Deputy Scott arrived home from work shortly after 4:30 p.m. on January 13, 2005. His 9-year-old son and 4-year-old daughter were at home with defendant, who had been babysitting. Defendant left shortly thereafter and went to his mother's house, where he lived, which was approximately 150 to 200 yards from Deputy Scott's mobile home. Both homes were on a ten-acre tract bought by Deputy Scott's parents.[1]
Deputy Scott noticed that his 4-year-old daughter was upset and crying. After his wife, Stacie Scott, came home from work they both talked to the child, who stated that defendant had been messing with her. Apparently, the child provided no further details about what had happened.
Deputy Scott changed into his civilian clothes (although he kept on his work pants, which had a pair of handcuffs in them) and got into his wife's car and drove the short distance to his mother's house. Upon arriving at his mother's house, Deputy Scott knocked, opened the unlocked door, entered and called out for defendant. Deputy Scott testified that he frequently entered his mother's house in this manner. Deputy Scott testified that he wanted to find out why his daughter was upset.
Deputy Scott saw defendant near the kitchen. Defendant was wearing only gym shorts, no shirt or shoes. Deputy Scott asked defendant why his daughter was crying. At first, defendant denied that anything had taken place. Upon further questioning, defendant admitted that he had touched the child on her bare butt and ducked his head and said, "I'm sick." At that point, Deputy Scott handcuffed defendant, then used the house phone to call the sheriff's office to send a deputy. When he learned that there were no officers in the vicinity, Deputy Scott took defendant back to his mobile home to make a switch to his patrol car. Deputy Scott testified that he read defendant his Miranda rights on the way to the sheriff's office. When he arrived at the sheriff's office parking lot, Deputy Scott gave custody of defendant to Deputy Emmett Moore.
Defendant's Confession while in Custody
Shortly after arriving at the sheriff's office, defendant was interviewed by Detective Johnny Taylor and Deputy Michael Antilley. After determining defendant's ability to read and write and his educational level, Detective Taylor gave defendant a written copy of the Miranda rights card and read the rights form to him. Detective Taylor testified that as he read the rights to defendant, he occasionally made eye contact with defendant to see whether he looked confused. Detective Taylor read the first paragraph to defendant (which advised defendant of his Miranda rights), and at the conclusion, asked defendant if he understood those rights. Defendant responded that he did. Detective Taylor proceeded to read the second paragraph of the card concerning whether defendant *785 wished to waive those rights. After reading the paragraph, Det. Taylor asked defendant if he wanted to waive the rights and make a statement. Defendant said yes and signed the form.
Defendant made statements that were transcribed by Deputy Antilley as they were talking. Defendant admitted that he touched the child on her bare butt and genital areas on several occasions with both his finger and tongue.[2]
Officer Antilley testified that he placed defendant back in the holding cell after their first interview so that he could retrieve a computer disk on which to save the statement (rather than doing so on the computer's hard drive). Deputy Antilley brought defendant back out into the booking room shortly thereafter, at which time defendant gave an additional statement admitting that the child had touched his penis. During the second interview, only Det. Antilley and defendant were present.
The Alleged Illegal Entry
Defendant argues that the warrantless entry and arrest by Deputy Scott were illegal. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause . . ." The Fourth Amendment's purpose is to protect citizens against unreasonable searches and seizures by the government.[3]See, Camara v. Municipal Court of City & County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).
For Fourth Amendment purposes, a search or seizure requires a governmental intrusion into an area where an individual has a reasonable expectation of privacy. The Fourth Amendment protects people, not places, but place has an important role in determining whether the individual's Fourth Amendment rights are implicated. See Minnesota v. Carter, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). It does not apply, however, to searches or seizures performed by individuals acting in their capacity as private parties. United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). See, U.S. v. Ginglen, 467 F.3d 1071 (7th Cir.2006), holding that a warrantless entry of defendant's home by defendant's son, an off-duty police officer from another city who suspected that his father was wanted in connection with a bank robbery, was lawful because he did not act in an official capacity but rather as private citizen out of concern for his father.
Useful criteria in determining whether an individual was acting as a private party or as an instrument or agent of the government are whether the government knew of and acquiesced in the intrusive conduct, whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends, whether the private actor acted at the request of the government and whether the government offered the private actor a reward. U.S. v. Ginglen, supra.
Great weight is given to the trial court's factual finding; however, the ultimate issues of the legality of the entry, arrest, and voluntariness of subsequent statements *786 are legal questions which this court reviews de novo. Where, as in this case, the trial court has made no findings of fact, a reviewing court must reach into the record to determine the underlying history. State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, writ denied, 06-2976 (La.03/09/07), 949 So.2d 441. This Court considers the entire record when passing on the correctness of a suppression ruling. State v. Blank, 04-0204 (La.04/11/07), 955 So.2d 90, cert. denied, ___ U.S. ___, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).
The record shows that Deputy Scott went to his mother's house to find out why his 4-year-old daughter was upset. He did not wear his uniform, drive his patrol car, notify his office, or take a radio. His actions in entering the home are consistent with a concerned father attempting to address a private inter-family issue. Deputy Scott did not collect any physical evidence while inside the home. Moreover, after learning of the circumstances involving a serious danger to others, Deputy Scott acted responsibly by calling the sheriff's office. He tried unsuccessfully to have the sheriff's office send another deputy to the house to handle the matter. Deputy Scott had to use the house phone to make the call as he did not bring a police radio or cell phone. When he was advised that there were no other deputies in the area, Deputy Scott went back to his home to switch to his patrol car. It is clear that Scott's primary objective in entering the house pertained to his children's well-being rather than law enforcement.
Deputy Scott's personal motivation supports the trial court's and this court's conclusion that he acted as a private citizen and not as a government agent when he entered his mother's home.
Moreover, Deputy Scott's entry into his own mother's home was not unreasonable. The evidence adduced does not establish that defendant had a subjective expectation of privacy to preclude his own brother from entering their mother's house (a house in which Scott used to reside) or that such expectation is one that society is prepared to recognize as reasonable and legitimate in this unique situation. See, State v. Horton, 42,199 (La.App.2d Cir.06/20/07), 962 So.2d 459. Deputy Scott testified that he frequently entered the house without knocking and called out for his brother or mother, and he was never precluded from doing the same. Even on this particular occasion, defendant did not ask Deputy Scott to leave but voluntarily engaged in conversation with his brother in the house. The evidence also shows that defendant had equal authority to enter Deputy Scott's trailer just down the road. The totality of the circumstances compels a finding that the entry was not illegal under the particular circumstances of this case.
The Arrest
It is axiomatic that a valid arrest for criminal activity is not a constitutionally unreasonable seizure. La. C. Cr. P. art. 213 provides, in pertinent part that a peace officer may make a warrantless arrest when (1) the person to be arrested has committed a felony, although not in the presence of the officer, or (2) the officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. Here, based on defendant's admissions to Deputy Scott, the trial court was correct when it found that Deputy Scott had probable cause to believe that defendant had committed a felony.
Statement to Deputy Scott and Custodial Confession
Defendant seeks to suppress his incriminating statements made to Deputy Scott *787 because he was not advised of his Miranda rights prior to Deputy Scott's questioning. Defendant also argues that his confession to Detective Taylor and Officer Antilley is inadmissible. Specifically, defendant complains that his emotional and physical distress rendered his confession involuntary.
At the first suppression hearing only Deputies Scott and Taylor testified. At the second hearing testimony was taken from Deputy Scott, Detective Taylor, and Officer Antilley, as well as from defendant. Defendant testified that Deputy Scott was loud and that he hit him in the face during the discussion at their mother's house. Defendant denied making any statements to Deputy Scott about what he did to the child. Defendant also testified that Deputy Scott allowed his wife, Stacie, to punch defendant in the back of the head for several minutes while switching between cars. Defendant admitted that he could read and write, and he read the waiver of rights form at the hearing but indicated that he was unable to read three words (i.e., "presence," "appointed," and "interrogation"). Defendant testified that he had no formal education past the seventh grade and that he had to repeat both the second and seventh grades.
Defendant's Statements to Deputy Scott
With respect to defendant's complaints about the lack of Miranda warnings prior to his incriminating statements to Deputy Scott, such warnings are not required when there is no custodial interrogation. Under the dictates of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Here, defendant was not in custody and was not deprived of his freedom in any significant way at the time he made his statements to his brother. See State v. Blank, supra. Defendant made no further incriminating statements to Deputy Scott after he was arrested.
Statements Made During Custodial Interrogation
At a suppression hearing, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La.App. 2d Cir.04/07/00), 756 So.2d 1272, writ denied, 00-1427 (La.05/11/01), 791 So.2d 1288. Testimony of the interviewing police officers alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Henderson, 31,986 (La.App.2d Cir.08/18/99), 740 So.2d 240.
With respect to defendant's confession to Detective Taylor and Officer Antilley, there is no question that defendant was informed of his Miranda rights prior to his confession.[4] The central issue is whether defendant sufficiently understood his Miranda rights to make a knowing *788 intelligent waiver of such rights, and whether his confession was otherwise voluntary. This is necessarily a case-by-case endeavor where the court must weigh the totality of the circumstances and examine their impact on defendant as to each of his statements. There are "red flags" which arouse suspicion and close scrutiny.
At all times, defendant stated that he understood his rights and he never appeared to be unable to do so. At the second suppression hearing, defendant was able to read aloud the waiver of rights form and could provide a logical and lucid explanation of his rights notwithstanding his purported inability to understand three particular words. Although admittedly defendant was upset and crying throughout the custodial interrogation, this did not prevent him from giving a detailed account of his actions with respect to the child. At no point during the interrogation did defendant ask to stop the questioning. Indeed, his first custodial statement represented an attempt to minimize the wrongdoing, and the evolution of his story over time reveals a state of mind which cannot be readily associated with any finding that he lacked understanding of his constitutional rights.
Defendant also complains about purported physical distress. An obvious "red flag" which bears close scrutiny is that defendant was wearing only gym shorts, he was cold, and was never offered an opportunity to put on more clothes. We note that it was after dark and in January.
Defendant's attire was the way he presented himself when visited by Deputy Scott at their mother's house. Certainly, Deputy Scott was wrong in not having defendant dress before taking him from his residence and the custodial interrogators should have given defendant appropriate clothing before continuing their questioning. Defendant, however, never once complained during the interrogation that he was cold, asked for clothes, or otherwise required that the interview be terminated. Defendant was not stripped of his clothing by police or otherwise made to cower in fear for a prolonged period of time. Cf. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). The totality of the circumstances do not indicate that defendant's capacity for self-determination was critically impaired. State v. Blank, supra; see also, Jurek v. Estelle, 623 F.2d 929 (5th Cir.1980) (en banc) (holding that a first confession, given within 24 hours of arrest, was voluntary even though defendant lacked socks, shoes, or a shirt).
As for the purported physical mistreatment by Deputy Scott and his wife, it is apparent that the trial court credited the testimony of Deputy Scott over that of defendant on this issue. This finding is supported by the record and should not be disturbed on appeal.
Defendant's minimal formal education (he dropped out of school at the 7th grade level) and purported limited comprehension skills also do not render his confession involuntary under these facts. Clearly defendant understood the circumstances and had the capacity to make choices. See State v. Green, 94-0887 (La.05/22/95), 655 So.2d 272; State v. Brooks, 92-3331 (La.01/17/95), 648 So.2d 366; State v. King, 41,084 (La.App.2d Cir.06/30/06), 935 So.2d 815, writ denied, 06-1803 (La.02/16/07), 949 So.2d 411.
In light of the foregoing, there is no error in the trial court's ruling that defendant's statements were made freely and voluntarily. This assignment is without merit.
Error Patent
A review of the record reveals one error patent. At all relevant times, molestation of a juvenile has been defined *789 as a sex offense by La. R.S. 15:541(14.1). La. R.S. 15:542 provides registration requirements for sex offenders. In addition, La. R.S. 15:543 requires that the trial court notify a defendant charged with a sex offense in writing of the registration requirements, and that such notice be included on any guilty plea forms and judgment and sentence forms provided to defendant.[5] Here, the forms provided to defendant made no mention of the sex registration requirements. There being no indication in the record as to whether defendant is even aware of the sex offender registration requirements, we remand this matter to the trial court solely for the purpose of providing the appropriate written notice to defendant of the sex offender registration requirements within 10 days of the rendition of the opinion and the filing of written proof that defendant received notice in the record of the proceedings. See, e.g., State v. Turner, 05-75 (La.App. 5th Cir.05/31/05), 904 So.2d 816, writ denied, 05-2591 (La.05/26/06), 930 So.2d 20; State v. Williams, 02-0707 (La.App. 3rd Cir.03/05/03), 839 So.2d 1095.

Conclusions
For the foregoing reasons, defendant's conviction and sentence are affirmed and the case is remanded.
NOTES
[1] Deputy Scott's father died intestate several years earlier and although a succession had not been open, under Louisiana law Deputy Scott would be considered the owner of an undivided interest in this property subject to his mother's usufruct.
[2] Rape is the act of anal, oral, or vaginal sexual intercourse committed upon a person without his or her lawful consent. La. R.S. 14:41.
[3] The Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. I, § 5.
[4] Defendant's appellate counsel does argue in his brief that defendant "was never advised by any law enforcement official of the charges forming this investigation and interrogation until after he was booked," as purportedly required by Article 1, Sec. 13 of the Louisiana Constitution. This is a mischaracterization of the testimony. Officer Antilley merely testified that they never "read him any criminal code articles about what crimes he was being investigated for" until after he was booked. Indeed, defendant testified that he was aware of the reasons for the questioning at the time. The constitution does not require that a defendant be read the technical definition of a crime in order to be fully advised of the reason for his arrest or detention. State v. Jackson, 27,855 (La.App.2d Cir.04/03/96), 672 So.2d 215, writ denied, 96-1386 (La.11/01/96), 681 So.2d 1258, cert. denied, 520 U.S. 1252, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997).
[5] The Louisiana legislature has since substantially revised the sex offender registration and notification requirements effective January 1, 2008. The newly enacted registration and notification requirements now set forth the particular form to be used by the trial courts in notifying sex offenders of the registration requirements, among other things. La. R.S. 15:543.1 (eff. 1/1/08). Acts 2007, No. 460 (which amended the registration and notification laws effective January 1, 2008) provide in part:

Any person under an obligation to register as of the effective date of this Act shall comply with the requirements contained in this Act and shall be given credit for having fulfilled their obligations to register for the length of time equal to their previous registration in compliance with law. (Emphasis added.)
(Given the opinion in this matter will not be rendered until after January 1, 2008, the trial court should follow these new registration and notification requirements).