STEWART, J.
|,The defendant, Javontae Drake, was convicted of one count of aggravated burglary and one count of forcible rape. He was sentenced to 30 years’ imprisonment at hard labor for the aggravated burglary conviction, and 40 years’ imprisonment at hard labor, with the first 20 years to be served without the benefit of probation, parole, or suspension of sentence, for the forcible rape conviction. The sentences were ordered to run concurrently. Drake now appeals. For the reasons set forth below, Drake’s convictions and sentences are affirmed, but we are remanding this case to provide him with the appropriate notice of the sex offender registration requirements.
FACTS
On June 17, 2007, M.W. was studying in her home and fell asleep on her couch. At some point after midnight, she was awakened by someone striking her in her right eye. Initially, M.W. tried to fight off her attacker, but she became tired and succumbed to him. He then raped her. M.W. identified her attacker by a tattoo, “Drake.” Javontae Drake was later arrested and charged with two counts of forcible rape of M.W. and one count of aggravated burglary.
A jury trial began in this matter on March 24, 2010. Assistant Police Chief Franklin Bilberry, with the Farmerville Police Department, testified that on June 17, 2007, he was on duty. He further testified that at approximately 3:30 a.m., while he was standing outside a local Huddle House, M.W. and her son drove up and informed him that she had been ^assaulted. Bilberry immediately noticed that her right eye was swollen. He dispatched other officers and followed M.W. to Union General Hospital.
Officer Michael Bryan with the Farmer-ville Police Department testified that on June 17, 2007, he was on patrol working the night shift. At approximately 12:52 a.m., he pulled into a parking lot at Independent Auto in Farmerville because he saw an individual walking through the lot. He stopped the person to identify him. The person was identified as Javontae Drake, the defendant. Bryan asked a few questions, and Drake was free to leave.
Later, Bryan received a call of a possible assault on a female, and he went to Union General Hospital. At the hospital, he interviewed M.W. He observed a bruise around her right eye, scratches, bruises and bite marks on her arms, and a laceration on her thigh. From the information she provided, Bryan believed he knew the possible suspect, who was the defendant, Javontae Drake.
When Bryan left the hospital, he went to 602 Taylor Street, the address where Drake previously stated he lived. Before arriving there, he saw Drake walking on West Boundary Street. Bryan stopped and arrested him. According to Bryan, Drake was wearing a pair of jeans and shoes, but no shirt. He had scratches on his ear and back, and glass fragments on his chest. Before going to the station for questioning, Bryan stopped at Drake’s residence to retrieve the shirt he had on earlier when Bryan first had contact with him.
| oAfter bringing Drake to the police station, Bryan went to M.W.’s house to retrieve evidence. At M.W.’s house, Bryan noticed a broken window in the front of the house. There was also broken glass inside the house, with only a small amount outside. He testified that Drake’s address was approximately four houses down the street from M.W.’s house. Bryan retrieved some shirts, a comforter and a pillow from M.W.’s house. On cross-exam *455 ination, Bryan testified that M.W. provided him with a key to enter her residence. He stated that the door was not broken or busted. Bryan also indicated that he took photos of the crime scene, as well as Drake’s cuts and scratches, and turned them in to the Farmerville Police Department with all the other evidence. However, the photos were lost.
Officer J.D. Simpson, with the Farmer-ville Police Department, testified that at approximately 4:00 a.m. on June 17, 2007, he received a phone call from dispatch to assist officers with an investigation. Pursuant to that call, Simpson went to Union General where he met M.W. He noticed numerous lacerations, bruises, and human bite marks on her arms, face and legs. Simpson also noticed that her right eye was swollen and extremely red.
After gathering some information from M.W., he went to the police station. Although Drake had previously been read his Miranda rights, Simpson read them again, and Drake acknowledged that he understood those rights. Simpson testified that he observed some scratches and slivers of glass on the defendant. During questioning, Drake denied any involvement with M.W. After that denial, Simpson took a Polaroid photo of |4him and prepared a photo lineup. He then went back to Union General Hospital at approximately 5:30 a.m. on June 17, 2007, to show M.W. the lineup. Simpson testified that within a minute or so of viewing the lineup, M.W. positively identified Drake as the man who attacked her. Simpson then returned to the station to interview the Drake.
During this second questioning, Simpson testified that Drake admitted to knowing M.W. and stated that he pushed the door open to M.W.’s house and walked in. He then stated that they began fighting. Simpson testified that Drake told him that prior to the fight, he had not spoken with M.W. but he “liked her.” Drake also told Simpson that he had consensual sexual intercourse with M.W. on two occasions that morning. After Drake gave his statements, he consented to two saliva samples. Those samples were taken to the crime lab.
The victim, M.W., testified that Drake was not a personal acquaintance, and that she never had any contact with him before June 17, 2007. She further testified that she did not consent to Drake’s being in her home. After he struck her, she was dazed and tried to stand up, but he was choking her. Eventually, she broke free from his hold and ran outside screaming. He ran after her and began choking her again. Unable to find anything to pry him off of her, she testified that she crashed him into a large window at the front of her house. Drake fell into the glass. She then picked up a piece of glass and started poking him with the glass. M.W. grabbed hold of the support beams to her house and held on to keep him from dragging her back into the house. However, he started biting her. He bit |sher approximately 17 times.[1] M.W. testified that she became tired, her body was exhausted, and Drake was then able to drag her back into the house. She testified that he told her to lie on the floor and take her clothes off. He performed oral sex on her and penetrated her vaginally with his penis. After the sexual intercourse, he tried to act normal, “like he was [M.W.’s] friend,” by wrapping his arm around her and talking to her. M.W. testified that after talking to her for some time, Drake told her he wanted to have sex *456 again. He then penetrated her vaginally with his penis again. She testified that both instances of sexual intercourse took place without her consent. After the second time, she pleaded with him to let her go. He finally complied.
M.W. testified that she called 911, but she did so while Drake was sitting next to her on the couch. M.W. stated that her phone was on silent, so he could not hear her dial the number. She testified that after she dialed the number, she just held the phone and continued talking to Drake. As she talked to him, she stated her address so that the 911 operator could send the police to help her.
M.W. testified that her son, Kamrine, was present in the home when these events occurred. However, she testified that he did not hear this incident taking place, since the living room door and his bedroom door were closed, he was listening to a CD, and he sleeps “hard.” Before Kamrine entered the room, M.W. changed her bloody shirt and put on sunglasses so she would not alarm him. She had to call his name numerous times before he responded. As M.W. and Kamrine got in the car, Drake left walking in |fithe direction of his residence. M.W. drove to the Huddle House, her place of employment, because she knew it was typical for a police officer to be there. When she arrived at Huddle House, she saw Officer Bilberry, who told her to go to the hospital. Accordingly, she went to Union General Hospital in Farmerville. She informed them she had been raped, and she was treated for a cut on her thigh. Later, her mother drove her to St. Francis Medical Center in Monroe for a sexual assault exam by a sexual assault nurse examiner (SANE).
Correando “Cory” Davis testified that he was with Drake at Drake’s sister’s house the day he was arrested for this crime. According to Davis, M.W. stopped her van in the street in front of Drake’s sister’s house and asked Drake “is [sic] you still going to come to my house?” Davis could not recall Drake’s response to that question. After M.W. drove off, Davis testified that he gave Drake $15.00 and Drake went to M.W.’s house as he was asked to do. Davis stated that he saw Drake go up to the house, but he did not see him go inside. Fifteen or twenty minutes later, Davis testified that Drake came back to him and asked for an additional $15.00, but he did not have any more money to give to him. While Drake was at M.W.’s house, Davis testified that he did not hear any screaming or yelling, nor did he see any police until they came later and arrested the defendant. Davis testified that when Drake returned from M.W.’s house, he noticed a cut on him.
Drake testified that on June 17, 2007, he was 17 years old and lived with his sister. His sister’s house was approximately four houses down |7from M.W.’s house. He stated that he met M.W. in October 2006. M.W. would often stop by as she was driving down the street and call him to the truck.
Drake further testified that prior to June 2007, he would go to M.W.’s house, and they would sit on the couch, watch television, talk, and have sex. They would also drink alcohol, particularly beer, and sometimes M.W. would do drugs, namely, cocaine and marijuana. He testified that the first time he ever went to M.W.’s house was in February 2007. He further testified that he used a condom every time he had sex with M.W., and that he never had oral sex with her.
Drake testified that on June 17, 2007, he was at his sister’s house all day until 7:00 p.m. or so when one of his friends took him to his cousin, Otis Heard’s, house. He left his cousin’s house walking back to his sis *457 ter’s house. As he was walked across a parking lot, he was stopped by a police officer who identified him, and then permitted him to continue walking home. When he returned home, his friend Cory Davis was outside. Drake and Davis sat outside talking. M.W. drove by, stopped her vehicle in the street, and asked him to come to her house later. Prior to going to M.W.’s house that night, he asked Davis for money. Davis gave him $15.00. Later that evening, he walked to M.W.’s house, knocked on the door, and Kamrine let him inside the house. Kamrine then went into another room. When he entered the house, M.W. was sitting on the couch watching television and she had books on her lap. They talked for a while and then had sex. After sex, M.W. asked him for some money, and he gave her the |s$15.00 he received from Davis. When M.W. asked for more money, he left the house, went back to his sister’s house, and asked Davis for more money, but Davis did not have any more. He testified that he went back to M.W.’s house “opened the door and went in the house.” He testified that once he was inside M.W. asked for more money and “told me that I was lying, that I had some money.” She then stabbed him with a red blade. He further testified that as he was trying to leave her house, she was still swinging at him with the red blade in her hand. She then pushed him into the glass window. He stated that they both received cuts from the glass. He admitted that he probably hit her in the eye because they were fighting. However, he did not remember biting her. Drake testified that at some point, they went back in the house and apologized to each other for the fight that had just occurred. They sat down on the couch and M.W. had a cell phone in her hand playing with the ring tones on the phone. M.W. stated she needed medical attention, and he agreed. He left her house as she was leaving with her son, Kamrine.
Drake went home to his sister’s house, cleaned up his cuts, and changed clothes. Approximately 10 to 15 minutes later, he noticed the police were outside M.W.’s house. Shortly thereafter, the police drove down the street and stopped in front of his sister’s house. The officer read him his rights and arrested him, without stating why he was being arrested. Before leaving his sister’s house, the officer asked his permission to go into his bedroom. He gave them permission, and they retrieved some items that they put in the trunk. Drake was unaware of what items they took.
| ^During questioning at the police station, Drake initially denied knowing M.W. Later, after the officers showed him pictures of M.W. taken at the hospital, he admitted that he knew her. Drake testified that he told Officer Simpson that he and M.W. were “talking and going together.” He also told them that he and M.W. had consensual sex twice that night. He testified that he did not threaten to kill M.W.
On cross, Drake testified that he had sex with M.W. twice when he went to her house the first time, and that he used a condom on both occasions, which he discarded in M.W.’s trash.
M.W. identified Exhibit D-l as her mother’s keys, which she kept on the floor of a red car parked outside her house. On that key ring she kept a spare key to her home. M.W. further testified that these keys were kept in the vehicle so that her family members could get into her house if she was away. Prior to the incident on June 17, 2007, she noticed the keys were missing.
Drake identified Exhibit D-l as a set of keys M.W. gave him in January. He as *458 serted that the keys were given to him prior to the two ever engaging in sexual relations.
The jury found Drake guilty of one count of forcible rape and one count of aggravated burglary. On June 1, 2010, after consideration of the presentence investigation report, and the factors set forth in La. C. Cr. P. art. 894.1, the court sentenced Drake to serve 30 years’ imprisonment at hard labor for the aggravated burglary conviction. He was sentenced to 40 years’ imprisonment at hard labor, with the first 20 years to be served without the | mbenefit of probation, parole or suspension of sentence, for the forcible rape conviction. The sentences were ordered to run concurrently with one another. This appeal followed.
LAW AND DISCUSSION
Insufficiency of Evidence — Aggravated Burglary
In the first assignment of error, Drake argues that the evidence was insufficient to prove that he committed aggravated burglary. He contends that the state lacked proof that he did not have permission to enter M.W.’s residence. Drake also asserts that the state lacked proof that he entered the residence with the intent to commit a felony therein.
The question of sufficiency of evidence is properly raised by a motion for post verdict judgment of acquittal. State v. Howard, 31,807 (La.App. 2 Cir. 8/18/99), 746 So.2d 49, writ denied, 1999-2960 (La.5/5/00), 760 So.2d 1190. Although the record does not reflect that defendant filed a motion for post verdict judgment of acquittal pursuant to La. C. Cr. P. art. 821, this Court will consider sufficiency arguments in the absence of such a motion. Id.
When issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, *459 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
La. R.S. 14:60 states in pertinent part: . , , , , . ,, An aggravated burglary is the unautho- . . , . i, . , ... , , ... nzed entering of any inhabited dwelling, „ , , , or of any structure, water craft, or mov- , . , able |12where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
Battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33.
In order to prove aggravated burglary, the state must prove beyond a reasonable doubt that the defendant made an unauthorized entry into an inhabited dwelling with the intent to commit a felony. In addition, the state must prove beyond a reasonable doubt the existence of one of the three aggravating factors. State v. Manning, 44,403 (La.App. 2 Cir. 6/24/09), 15 So.3d 1204.
The evidence presented at trial, viewed under the Jackson standard, was sufficient to support the conviction of aggravated burglary pursuant to La. R.S. 14:60(3). At trial, the victim, M.W., testified that Drake entered her home without her permission, hit her in the eye, and choked her while inside the residence. After managing to break free from the defendant, M.W. ran outside only to be forced back inside the house by the defendant, at which time he raped her. Evidence of Drake’s violence upon M.W. was visible, i.e., bruised eye, and was observed by Officers Bilberry, Bryan, and Simpson. • M.W. positively identified Drake in a photo lineup as the person who attacked her in her home in the early morning of June 17, 2007. Therefore, M.W.’s testimony was sufficient to prove that Drake entered her f, , I,qresidence without permission with the , L n . intent to rape her, and committed a bat-,1 ’ . tery upon her when he struck her in the J 1 e^e‘
This court does not reweigh evidence or assess the credibility of the witnesses. State v. Smith, supra. The jury was given the opportunity to assess the credibility of the state’s witnesses and this court must accord great deference to the jury’s decision to accept that testimony as credible. State v. Hill, supra.
This assignment of error therefore is without merit.
Insufficiency of Evidence — Forcible Rape
In the second assignment of error, Drake argues that the state failed to prove that the sexual intercourse between the defendant and M.W. was not consensual. To support this assignment, he asserts that there is no medical testimony to support forced sexual intercourse. Drake also alleges that M.W. did not tell the 911 operator that she had been raped.
 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2 Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. This is equally applicable to the testimony of victims of sexual assault. State v. Robinson, 36,147 (La.App. 2 Cir. 12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. Such testimony alone is sufficient even where the state does not *460 introduce [ umedical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, supra; State v. Ponsell, supra. Forcible rape is defined in La. R.S. 14:42.1, which provides in pertinent part:
A. Forcible rape is rape committed when the anal, oral or vaginal sexual intercourse is deemed to be without the consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believed that such resistance would not prevent the rape.
At trial, M.W. testified that after Drake struck her in the eye, she managed to break free from his hold and run outside. When they were outside, M.W. fell into a window, which broke, in an unsuccessful attempt to stop the defendant from attacking her. Drake bit her approximately 17 times and threatened to kill her. The DNA analysis confirmed that the defendant bit M.W. M.W. testified that although she held onto the iron beams outside her house so that Drake could not drag her back into the house, she became tired and exhausted from the physical beating and biting by the defendant. At that point, Drake was able to drag and force her back inside the house. Once inside the house, he performed oral sex on M.W. and vaginally penetrated her, without her consent.
Patty McFadden, an expert in the field of sexual assault nursing examination, testified that on June 17, 2007, she was on call for St. Francis Hospital and was called in to perform a sexual assault examination of M.W. The examination revealed that M.W. had abrasions and redness on her 1 iSvaginal tissue. McFadden testified that said abrasions could have occurred during either consensual sexual intercourse or sexual assault.
Cassandra Hernandez, an expert in DNA identification who works at the North Louisiana Criminalistics Laboratory, testified that she performed a DNA analysis on a rape kit for M.W., where she compared samples taken from Drake’s body and M.W.’s body, including left-arm bite mark swabs, left neck swab, shoulder bite mark swab, genitalia swabs, clitoris swabs, vaginal swabs and vaginal washings. Hernandez testified that the DNA sampled from the bite marks was consistent with being a mixture of M.W.’s own DNA and Drake’s DNA. The DNA profile was 94.7 trillion times more likely to be the DNA of Drake rather than that of an unknown related individual. As for the epithelial fraction from M.W.’s vaginal vault, the sperm fraction of the vaginal swab was a mixture of DNA from two individuals, a major contributor and a minor contributor. Hernandez testified that Drake could not be excluded as being the major contributor. In fact, the probability was approximately one in 120 quadrillion that the sperm fraction was from someone other than him.
As the victim of sexual assault, M.W.’s testimony alone was sufficient to prove the commission of forcible rape by the defendant. State v. Robinson, supra; State v. Ponsell, supra. Further, her account of the events that transpired was supported by scientific and physical evidence obtained shortly after the incident occurred.
We see no error in the trial court’s conclusion the Drake was guilty of forcible rape. Therefore, this assignment of error is without merit.
| Rouble Jeopardy
In the third assignment of error, Drake argues that his prosecution for the *461 offense of aggravated burglary and forcible rape constituted double jeopardy.
The Fifth Amendment to the United States Constitution provides that no person shall be “subject for the same offenses to be twice put into jeopardy of their life or limb.” State v. Redfearn, 44,709 (La.App. 2 Cir. 9/23/09), 22 So.3d 1078, writ denied, 2009-2206 (La.4/9/10), 31 So.3d 381; State v. Brown, 42,188 (La.App. 2 Cir. 9/26/07), 966 So.2d 727, writ denied, 2007-2199 (La.4/18/08), 978 So.2d 347. The double jeopardy clause was made applicable to the states through the Fourteenth Amendment, and Article I, § 15, of the Louisiana Constitution contains a similar guarantee. Redfearn, supra. The guarantee provides three central constitutional protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after convictions; and, (3) protection against multiple punishment for the same offense. Redfearn, supra.
Louisiana uses both the “Blockburger test” and the “same evidence test” in determining whether double jeopardy exists. State v. Ceasar, 37,770 (La. App. 2 Cir. 10/9/03), 856 So.2d 236. In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court held that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof [17of an additional fact which the other does not. Louisiana also uses the broader “same evidence” test which dictates that:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one.
State v. Steele, 387 So.2d 1175 (La.1980); State v. Robertson, 511 So.2d 1237 (La.App. 2 Cir.1987), unit denied, 516 So.2d 366 (La.1988). This test depends on the proof necessary for a conviction, not the evidence that is actually presented at trial. State v. Knowles, 392 So.2d 651 (La.1980).
After applying the Blockburger test in this case, we find that there are no violations of double jeopardy. The evidence required for a finding of guilt for the aggravated burglary would not be needed to support a conviction of forcible rape. The crime of aggravated burglary requires the element of an unauthorized entry; forcible rape does not. The crime of forcible rape requires the element of sexual intercourse; aggravated burglary does not.
Here, the state sought to prove that Drake committed aggravated burglary by entering M.W.’s home without authorization, with the intent to rape M.W., and committing a battery upon M.W. La. R.S. 14:60(3). At trial, M.W. testified that she did not consent to Drake entering her home. She awoke to him standing over her after he hit her in the eye. The aggravated burglary was complete at that time.
Further, M.W. testified that Drake choked her and bit her 17 times. After fighting M.W. and threatening to kill her, Drake was able to force M.W. back inside the house and rape her. M.W. testified that she did not | isresist the rape due to the beating and because her body was exhausted. Drake, therefore, committed two separate and distinct acts.
The evidence to support the conviction of aggravated burglary was not the “same evidence” necessary for the conviction of forcible rape. Thus, there are no double jeopardy implications.
This assignment of error is therefore without merit.
*462 ERROR PATENT
A review of the record reveals that the trial court failed to inform Drake of the sex offender notification and registration requirement as required under La. R.S. 15:543. Drake’s conviction of forcible rape, a violation of La. R.S. 14:42.1 and a “sex offense” under La. R.S. 15:541, requires he be subjected to the sex offender notification and registration requirements under Louisiana’s sex offender laws. La. R.S. 15:542. Additionally, La. R.S. 15:543 requires that the trial court notify a defendant convicted of a sex offense in writing, using the form contained in La. R.S. 15:543.1, of the registration and notification requirements. It further requires that such notice be included on any guilty plea forms and judgment and sentence forms provided to Drake, and that an entry be made in the court minutes stating that the written notification was provided. The record does not indicate that Drake was provided with any judgment and sentence form, or orally informed by the trial court of his registration requirements at his conviction and sentencing. As a result, remand is required for the purpose of providing the appropriate written notice to the defendant of the |19sex offender registration requirements. State v. Scott, 42,-997 (La.App. 2 Cir. 2/13/08), 975 So.2d 782.
CONCLUSION
For the reasons stated, we affirm Drake’s convictions and sentences. We also remand the matter for the purpose of providing him with the appropriate notice for the sex offender registration requirements.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.

. State introduced S-3, which were photographs of M.W. after the attack, M.W.’s house, and the bite marks on M.W.